Gene REESE, Appellant,

v.

UNITED STATES, Appellee.

No. 82–1004.

District of Columbia Court of Appeals.

Argued June 14, 1983.

Decided Sept. 29, 1983.

Timothy D. Junkin, Washington, D.C., appointed by the court, for appellant.

Bruce A. Peterson, Asst. U.S. Atty., with whom Stanley S. Harris, U.S. Atty., Michael W. Farrell and Barry M. Tapp, Asst. U.S. Attys., Washington, D.C., were on briefs, for appellee.

Before KERN and MACK, Associate Judges, and KELLY, Associate Judge, Retired.

KELLY, Associate Judge, Retired:

Appellant was convicted by a jury of first-degree murder while armed[1] and carrying a pistol without a license.[2] On appeal, he claims he was denied his Sixth Amendment right to the compulsory process of witnesses because of (1) the prosecutor's alleged intimidation of an alibi witness who thereafter refused to testify; (2) the trial court's decision to permit two of his witnesses to invoke blanket privileges against self-incrimination; and (3) the court's alleged intimidation of a third witness which deterred him from testifying. Appellant also claims a violation of his Sixth Amendment right to a speedy trial.[3] We conclude there was no reversible error and affirm.

On the evening of April 15, 1981, Jerome Wilson was shot and killed in the 4000 block of Wheeler Road, S.E. Appellant was arrested pursuant to a warrant and charged with the homicide on May 25, 1981. He was held on a $25,000 bond until his trial commenced on April 7, 1982.

The government's evidence at trial was that just before Wilson was shot, he, appellant and several other people had ridden around in a car eating chicken and smoking the narcotic "PCP." After they had argued over the chicken and a five dollar debt, appellant and Wilson got out of the car. A third man, Robert Montgomery, accompanied them as they walked down the street. Shortly thereafter, witnesses heard shots and saw Wilson stagger and fall into the street. Although no one actually saw who fired the shots, one witness said that he could see Montgomery's hands and that Montgomery had not held a gun. Other witnesses testified that appellant subsequently told them that he had shot Wilson. One said that appellant had shown him a gun.

Appellant testified that on the night of Wilson's death, he was with Wilson and some other friends until he left them to meet his half brother, Philip Palmer. He said that he and Palmer took a cab to Palmer's home in Northwest Washington where they spent the night. He claimed that neither he nor Palmer knew that Wilson had been shot until the following day.

Appellant attempted to call Philip Palmer, Carroll Montgomery and Charles Miller in his defense. However, these three witnesses unexpectedly refused to take the stand after they had appeared in the courtroom. Philip Palmer and Carroll Montgomery invoked their privileges against self-incrimination, which the court upheld. The court held Charles Miller in contempt after he declined to testify, stating that he had no Fifth Amendment privilege.

1. D.C.Code §§ 22–2401, 22–3202 (1981).

2. D.C.Code § 22–3204 (1981).

3. Appellant further contends that the trial court erred in permitting the government to hold for rebuttal evidence the written statement he had given to the police when he was arrested. We find this assertion meritless because appellant concedes the parties had previously agreed the government could use the statement for impeachment purposes and fails to proffer other evidence that the trial court abused its discretion in permitting this order of proof. See Gregory v. United States, 393 A.2d 132, 137 (D.C.1978).

## I. COMPULSORY PROCESS OF WITNESSES

### A. *Prosecutorial Intimidation of Defense Witness*

Philip Palmer was introduced to the jury on voir dire as a witness who would testify for appellant. During opening statement, the jury was informed that Philip Palmer would testify that he had been with appellant in another part of the city at the time the crime had allegedly occurred, thereby providing appellant with an alibi. A few minutes before he was to be called, the Assistant United States Attorney told one of Palmer's attorneys that if Palmer testified he might be charged as an accessory after the fact to murder. The attorneys interpreted the prosecutor's remark as a threat and advised their client to invoke his Fifth Amendment privilege not to testify.

After appellant objected to the prosecutor's action as improper and designed to chill his witness' intention to testify, the court held a hearing on the matter out of the jury's presence. Palmer's attorneys argued that he was justified in refusing to testify because (1) he did not want to be implicated in the murder charge in any way; and (2) if he testified and admitted that he had been on the streets after midnight, he would thereby admit that he had violated the early curfew condition of his pretrial release in an unrelated case. Noting that the government had not contested his refusal to testify before the grand jury, relying upon the curfew violation alone, counsel requested immunity from prosecution for the murder in exchange for Palmer's testimony. The court denied this request, stating that it was the prosecutor's province to grant immunity. It upheld Palmer's decision to invoke his Fifth Amendment privilege not to testify, however, after the prosecutor said that a government witness could testify that Palmer had been on the scene after the shooting.

Appellant's principal contention is that he was improperly deprived of the testimony of his witness, Philip Palmer, due to the remarks of the prosecutor. "The right of a defendant to establish a defense by presenting his own witnesses is a fundamental element of due process of law." *United States v. Simmons,* 216 U.S.App.D.C. 207, 210, 670 F.2d 365, 368 (1982) (per curiam) (citing *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967)), *aff'd following remand,* 226 U.S. App.D.C. 98, 699 F.2d 1250 (1983). Various courts have held that governmental interference can deprive a defendant of this right. *E.g., Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (defense witness intimidated by remarks of trial judge); *United States v. MacCloskey,* 682 F.2d 468 (4th Cir.1982) (federal prosecutor's warning to defense witness' attorney destroyed her choice to testify freely); *United States v. Hammond,* 598 F.2d 1008 (5th Cir.1979) (defense witness intimidated by remarks of FBI agent); *United States v. Smith,* 156 U.S.App.D.C. 66, 478 F.2d 976 (1973) (federal prosecutor's warning to the defense witness was plainly a threat which prejudiced the defendant).

In this case, the prosecutor told one of Palmer's attorneys that Palmer could possibly be charged as an accessory if his alibi testimony included facts which implicated him. There is no evidence that the prosecutor's reason for so acting was to chill the witness' intention to testify. Indeed, the trial court stated that the prosecutor might have done Palmer a favor by warning his attorneys because there was always a possibility of prosecution where the facts justified it and where there had been no grant of immunity, as here. Nevertheless, we conclude that it would have been reasonable for counsel to interpret the prosecutor's remark as a threat. We agree with the government that the potential harm of such an act by a prosecutor is greater where he has spoken directly to the witness, *see Smith v. United States, supra; United States v. Morrison,* 535 F.2d 223 (3d Cir.), *cert. denied,* 429 U.S. 824, 97 S.Ct. 78, 50 L.Ed.2d 87 (1976); but are not convinced that this unsolicited communication to the

witness' attorney was necessary, appropriate or timely.[4]  *See United States v. Mac-Closkey, supra.*

■■■  Where prosecutorial misconduct is alleged, the erroneous action must rise to the level of "substantial prejudice" in order to justify reversal.  *McCowan v. United States,* 458 A.2d 1191, 1196 (D.C.1983);  *Dyson v. United States,* 418 A.2d 127, 132 (D.C.1980).  As appellant objected to the prosecutor's alleged misconduct here, the test for "substantial prejudice" is whether the misconduct substantially swayed the judgment.  *See Dyson v. United States, supra,* 418 A.2d at 132;  *Gaither v. United States,* 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969) (citing *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)).

■  In *United States v. Simmons, supra,* the circuit court decided that the appellant there was not prejudiced by the prosecutor's warning a defense witness of the dangers of testifying falsely.  It concluded that the witness' refusal to testify resulted from considerations which were independent of any threats by the prosecutor, namely: (1) the witness' attorney had advised him to invoke his Fifth Amendment privilege not to testify; and (2) it was unlikely that the appellant would have called the witness because his attorney was concerned that the witness would perjure himself if put on the stand.  Similarly, in our case, there is evidence that Palmer's decision not to testify was not based solely upon a perceived threat by the prosecutor.  Although Palmer had agreed to testify at trial before the Assistant United States Attorney warned of the possibility of prosecution, both of the reasons that Palmer was advised not to testify in the grand jury remained at the time of the trial.  Thus, either of these reasons could have been the basis of counsel's recommendation that he not testify at trial.  Under these circumstances, it is impossible to say that but for the prosecutor's statement, Palmer would have testified; or to conclude that the judgment was substantially swayed by the prosecutor's misconduct.[5]

### B.  *The Privilege Against Self-Incrimination*

■  Appellant contends that the court erred in permitting Philip Palmer and Carroll Montgomery to invoke blanket privileges against self-incrimination.  We have said that "where a defendant's Sixth Amendment right [to the compulsory attendance of witnesses] is in conflict with a witness' properly asserted Fifth Amendment right, the latter will prevail."  *Letsinger v. United States,* 402 A.2d 411, 416 (D.C.1979);  *Alston v. United States,* 383 A.2d 307, 310 (D.C.1978);  *In re J.W.Y.,* 363 A.2d 674, 682–83 (D.C.1976).  In evaluating the validity of a witness' claim of the Fifth Amendment privilege, the trial court must determine, from all the circumstances, whether the claimant has reasonable cause to apprehend

---

4. A prosecuting attorney must avoid even the appearance of impropriety because of his special role in our judicial system.  As the Supreme Court said in *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935):

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He

> may prosecute with earnestness and vigor—indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

5. Appellant alleges that during the course of the trial, the prosecutor made several improper and outrageous statements to the jury.  We find that the cited statements did not constitute prosecutorial misconduct, and that if there was any error in their admission, it did not rise to the level of "substantial prejudice."  *See Dyson v. United States, supra,* 418 A.2d at 132.

a real danger of prosecution. *Alston v. United States, supra,* 383 A.2d at 312. The Supreme Court has explained the type of proof that is necessary:

> [I]f the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.

*Hoffman v. United States,* 341 U.S. 479, 486–87, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951).

■ The Fifth Amendment privilege of a witness is narrower than that of a defendant; a witness may not assert a blanket privilege where a narrower privilege would suffice to protect his interests. *Letsinger v. United States, supra,* 402 A.2d at 416; *United States v. Reese,* 183 U.S.App.D.C. 1, 7, 561 F.2d 894, 900 (1977). However, the trial court may bar a witness from testifying in the jury's presence if it properly concludes that the witness will refuse to answer essentially all of the questions which he may be asked. *Alston v. United States, supra,* 383 A.2d at 313; *United States v. Reese, supra,* 183 U.S.App.D.C. at 6, 561 F.2d at 899; *Bowles v. United States,* 142 U.S.App.D.C. 26, 32, 439 F.2d 536, 542

6. The court in *Bowles v. United States, supra,* 142 U.S.App.D.C. at 32, 439 F.2d at 542, said:
   [A] witness should not be put on the stand for the purpose of having him exercise his privilege before the jury.... This would only invite the jury to make an improper inference. For the same reason no valid purpose can be served by informing the jury that a witness has chosen to exercise his constitutional privilege. That fact is not one the jury is entitled to rely on in reaching its verdict. [Citation omitted.]

7. The government claimed that it would be entitled to ask Montgomery questions related

(1970) (en banc), *cert. denied,* 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971).[6]

■ After extensive discussions with the witnesses, their attorneys and the parties (out of the jury's presence), the court determined that Palmer and Montgomery might incriminate themselves if they testified. Montgomery's assertion of his Fifth Amendment privilege was based upon his pending trial for the first-degree murder of Andrew Anderson. The defense had proffered that Montgomery would testify, *inter alia,* that Andrew Anderson had had a motive for killing the decedent here (Jerome Wilson) because Wilson had intervened in an assault which Anderson had allegedly committed less than a week before Wilson's death. As it was likely that on cross-examination the government would probe into areas that could harm Montgomery in the defense of his own case, the court correctly ruled that Montgomery had a valid privilege against self-incrimination.[7] *See Alston v. United States, supra,* 383 A.2d at 312. The court also properly decided that Palmer had reasonable cause to fear prosecution given the government's proffer that a witness had seen Palmer near the scene of the shooting within minutes after it happened. *See id.* at 312. Moreover, because Montgomery and Palmer had personally informed the court that they had decided not to testify at all, the court did not err in failing to require them to invoke the privilege on a question by question basis. *See id.* at 313.[8]

to his bias and general credibility and that such questions would necessarily delve into Montgomery's role in Anderson's death because of the relationships between appellant, Montgomery, Wilson and Anderson.

8. Appellant's argument that the trial court erred in refusing to grant these witnesses immunity from prosecution is meritless. As the trial court noted, the authority to grant immunity rests in the sound discretion of the executive branch of the government. *In re J.W.Y., supra,* 363 A.2d at 684.

## C. Judicial Intimidation of Defense Witness

■ At the conclusion of the government's case, counsel for appellant told the court that he would call Charles Miller as a defense witness and that Miller would recant his grand jury testimony that appellant had confessed to the murder of Wilson. The court ordered counsel to bring Miller's attorney into court to confer with his client before he exposed himself to prosecution for perjury by so testifying.

After the attorney informed the court that Miller would testify, the trial judge advised Miller of his Fifth Amendment rights and that anything to which he testified could be used against him in another proceeding. The judge further explained the penalty for perjury.

Following a weekend recess, the prosecutor told the court that he had no evidence which implicated Miller in this case. He further said that Miller, who had been a government witness before the government decided not to call him, had expressed concern for his safety and that of his family if he testified. Miller's attorney then said that in spite of the prosecutor's proffer, his client had decided to invoke his Fifth Amendment privilege and face a contempt charge, if necessary. No evidence was proffered to demonstrate that Miller had cause to fear prosecution. The court subsequently ruled that Miller had no grounds for invoking the Fifth Amendment privilege. After asking Miller personally if he would testify, and being told that he would not, the court held him in contempt.

Relying upon Webb v. Texas, supra, 409 U.S. at 98, 93 S.Ct. at 353, appellant asserts that the trial court intimidated his witness, Charles Miller, and thus deprived him of his Sixth Amendment right to the compulsory process of witnesses. In Webb v. Texas, supra, the Supreme Court reversed the conviction, finding that the trial judge had threatened and harassed the sole defense witness, causing him to decline to testify. There is no evidence here that the trial court threatened or harassed Charles Miller. The court sought to insure that the witness was fully aware of his potential criminal liability by requiring that Miller's attorney come to court to confer with his client; and by personally informing Miller of his Fifth Amendment rights, and that his testimony could be used against him in subsequent proceedings, including prosecutions for perjury. Unlike the trial court in Webb, the court's remarks were not coercive or threatening; they were pointedly informational. Under these circumstances, we cannot conclude that the trial court intimidated the witness and deterred him from testifying.[9]

## II. SPEEDY TRIAL

■ Appellant was arrested on May 23, 1981, and charged with second-degree murder. Two days later, a $25,000 bond was set. Appellant subsequently filed several motions for bond review which were denied. On December 2, 1981, he filed a motion to dismiss for lack of a speedy trial. On December 9, approximately six months after his arrest, the grand jury returned an indictment charging appellant with first-degree murder while armed and with carrying a pistol without a license. Following a March 4, 1982 hearing, appellant's speedy trial motion was denied. His trial began on April 7, 1982.

In considering appellant's pretrial motion to dismiss, the court had to evaluate four factors: (1) the length of the delay between arrest and trial; (2) the reason for the delay; (3) the assertion of the right by the defense; and (4) the prejudice to the accused. Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972).

■ "[T]he delay that can be tolerated for a serious and complex charge . . . is considerably more than for a simple misdemeanor." Warren v. United States, 436

---

9. We note that there was no evidence that Miller had reasonable cause to apprehend a real danger of prosecution. See Alston v. United States, supra. Therefore, there was no error in the court's determination that Miller had no Fifth Amendment privilege not to testify.

A.2d 821, 834 (D.C.1981) (quoting *Rink v. United States,* 388 A.2d 52, 58 n. 11 (D.C. 1978)). However, a delay of a year or more between arrest and trial gives prima facie merit to a claim that an accused has been denied the right to a speedy trial and the burden thereafter shifts to the government to prove that no violation occurred. *Parks v. United States,* 451 A.2d 591, 600 (D.C. 1982); *Branch v. United States,* 372 A.2d 998, 1000 (D.C.1977). Here, there was an eleven month period between appellant's arrest and his trial. Thus, appellant has not established a prima facie speedy trial violation nor has the burden of proof shifted to the government. The fact that serious charges and complex issues were present weighs in the government's favor in this analysis.

■ In evaluating the reasons for the delay, the court should assign different weights to different reasons. *Bethea v. United States,* 395 A.2d 787, 791 (D.C.1978). For example, a speedy trial deprivation is easily shown when the prosecution creates or prolongs a delay in bad faith. *Id.* at 791. "Institutional delays such as court congestion, however, are weighed less heavily against the government and may be easily outweighed by an inadequate assertion of the speedy trial right or a low threshold of prejudice." *Id.* The record shows that a six-month segment of the eleven months of pretrial delay resulted from pre-indictment proceedings. There is no evidence that this six-month delay was deliberate or unjustified.[10] *Cf. Branch v. United States, supra,* 372 A.2d at 1001 (government intentionally delayed trial in order to try to obtain evidence that would implicate appellant in a more serious crime). Hence, we view this period as neutral institutional delay. *See Day v. United States,* 390 A.2d 957, 966 (D.C.1978); *Bethea v. United States, supra,* 395 A.2d at 791. The remaining five months of pretrial delay were due to the court's crowded docket and are chargeable to the government as institutional delay. *Bethea v. United States, supra,* 395 A.2d at 791. Thus, we conclude that the entire eleven month pretrial delay is attributable to a neutral institutional delay which weighs less heavily against the government.

■ Appellant's motions for bond review, the functional equivalents of speedy trial motions, *Branch v. United States, supra,* 372 A.2d at 1002, were filed on June 19, September 14 and December 2, 1981. He also filed a motion to dismiss on December 2, 1981. Appellant, therefore, asserted his speedy trial rights promptly and frequently.

■ "The speedy trial right is intended to protect against three types of prejudice: oppressive pretrial incarceration, anxiety and impairment of the defense." *Parks v. United States,* 451 A.2d at 601–02. Appellant was incarcerated during the entire eleven months between his arrest and trial. It is axiomatic that time spent in jail awaiting trial is detrimental to an individual, *Branch v. United States, supra,* 372 A.2d at 1002, but prejudice is suffered only to the extent that pretrial delay exceeds the time reasonably necessary to bring the accused to trial. *Parks v. United States, supra,* 451 A.2d at 602. Appellant has not claimed that he was prejudiced as a result of anxiety. He has, however, alleged an

---

10. The record does not support appellant's argument that the court erred in failing to compel the Assistant United States Attorney who formerly had handled the case to testify in the speedy trial hearing about the government's strategy in the grand jury investigation. As the strategy or direction of the investigation falls within the scope of the privilege protecting grand jury proceedings, *Fund for Constitutional Government v. National Archives and Records Service,* 211 U.S.App.D.C. 267, 280, 656 F.2d 856, 869 (1981), it was within the trial court's discretion to determine whether there was a particularized need or compelling necessity which outweighed the need for continued secrecy. *See Douglas Oil Co. of California v. Petrol Stops N.W.,* 441 U.S. 211, 222–23, 99 S.Ct. 1667, 1674–75, 60 L.Ed.2d 156 (1979); *United States v. Procter & Gamble Co.,* 356 U.S. 677, 683, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958). On this record, we cannot conclude that the court abused its discretion in limiting the scope of appellant's inquiries at the pretrial hearing to questions concerning how long the investigation had lasted and the circumstances which would indicate whether there had been any intentional delay.

impairment of his ability to defend caused by his pretrial incarceration. Although he asserts that there were witnesses for whom he had no opportunity to search, he has proffered no concrete evidence of the existence of such witnesses. Hence, we find unpersuasive his impairment of defense contention.

After reviewing the trial court's pretrial findings in light of the four *Barker* factors, we conclude that there was no violation of appellant's right to a speedy trial. Appellant's incarceration throughout the period between his arrest and trial and his assertion of his rights several times within the first months of incarceration weigh in favor of his claim. We agree with the trial court, however, that the actual length of the delay, the neutral nature of the reasons for the delay, and the low threshold of prejudice evident in the record outweigh these concerns.

### III.  CONCLUSION

We hold that appellant was not deprived of his Sixth Amendment right to the compulsory process of witnesses. Although we find improper the prosecutor's remarks to the attorney of one of appellant's witnesses, the error does not command reversal. Moreover, we conclude that the trial court correctly ruled on the validity of the Fifth Amendment privileges of the witnesses who unexpectedly refused to testify for appellant; and that the court's remarks to appellant's other witness were not coercive and threatening.

We further hold, after applying the *Barker v. Wingo, supra,* analysis, that appellant was not denied his Sixth Amendment right to a speedy trial.

*Affirmed.*