**Richard L. LYONS, a/k/a Walter Lyons, Appellant,**

v.

**UNITED STATES, Appellee.**

**Pamela K. COOPER, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 89–250, 89–299.**

District of Columbia Court of Appeals.

Argued Nov. 12, 1991.

Decided April 17, 1992.

---

W. Gary Koblman, Washington, D.C. (Brenda Grantland, was on the brief), for appellant Lyons.

Daniel M. Schember, Washington, D.C., appointed by this court, for appellant Cooper.

Peter R. Zeidenberg, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Roy W. McLeese, III, and Terence J. Keeney, Asst. U.S. Attys.,

Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, and FERREN and TERRY, Associate Judges.

TERRY, Associate Judge:

This case arises from a murder for hire committed in the course of appellants' cocaine-selling operation. Following a three-week trial, the jury found Lyons guilty of first-degree murder while armed,[1] assault with a dangerous weapon (ADW),[2] and conspiracy to distribute cocaine;[3] Cooper was found guilty of second-degree murder while armed,[4] ADW, conspiracy, and carrying a pistol without a license.[5] On appeal they raise several claims of error, of which we reject all but one. We reverse the convictions of both appellants and remand for a new trial because, in the somewhat unusual circumstances of this case, the government's failure to identify one of its witnesses during jury selection violated their Sixth Amendment right to an impartial jury.

## I

Appellants operated a cocaine-selling business in the area of North Capitol and O Streets, Northwest. Lyons would cut, package, and supply cocaine to other persons known as "runners," who would then sell the drug on the street. Cooper was one of Lyons' intermediate distributors as well as a runner. Sometime in the summer of 1985, Stephen Royster, also known as "Rex," began to cause trouble for appellants by stealing cocaine from them and their runners. Finally, in early February 1986, Lyons approached Daniel Roy and offered him money and cocaine to kill Royster. After initially hesitating, Roy accepted the offer.[6]

On February 26 Roy was selling cocaine for Lyons on North Capitol Street when Royster approached him and asked where Lyons was. Roy replied that Lyons was around the corner, and Royster went to talk with him. Roy then told another runner, Derrick Wimple, to "go get the pistol" because, Roy testified, he "figured that was the time" to kill Royster. Wimple went to Cooper's house, which was a short distance away on North Capitol Street, and there Cooper gave him a .38 caliber revolver. He brought the gun back to Roy, who then walked up to Royster on the street and shot him several times. After the shooting, Roy walked "nine steps" down the street to Cooper's house, handed her the gun, and left the area. According to Roy's testimony, Cooper was standing outside in front of her house and saw the shooting take place. Royster died two weeks later of his wounds.[7]

Less than an hour after the jury began its deliberations, a Metropolitan Police detective, James McCoy, informed the prosecutor that he had recognized one of the female jurors when he had testified two days earlier. The prosecutor immediately reported this fact to the trial judge, who halted jury deliberations and conducted a *voir dire* of the juror and Detective McCoy. The judge noted that the juror in question had been chosen on the first of two days of jury selection,[8] and that on that day the prosecutor had introduced the govern-

1. D.C.Code §§ 22–2401 and 22–3202 (1989).

2. D.C.Code § 22–502 (1989).

3. D.C.Code § 33–549 (1988).

4. D.C.Code §§ 22–2403 and 22–3202 (1989).

5. D.C.Code § 22–3204 (1989).

6. In accordance with a plea bargain, the government agreed to let Roy plead guilty to second-degree murder in return for his full cooperation in the investigation and prosecution of all the other persons involved in the shooting of Stephen Royster.

7. Roy left town for several days after the shooting. After he returned to the North Capitol Street neighborhood, he ran into Lyons on the street one day. Lyons gave him $1500, but neither of them said anything to the other.

8. On the first day, after nine jurors had been chosen, there were no more venire members left. Consequently, a new venire had to be summoned on the second day in order to select the remaining three jurors and three alternates. A full *voir dire* of the second venire was conducted on the second day.

ment's potential witnesses, but did not mention McCoy, nor were the prospective jurors asked whether any of them had any relatives or close friends in law enforcement. On the second day of jury selection, however, the prosecutor had read a list of government witnesses which included Detective McCoy.

Testimony during the *voir dire* revealed that five years earlier Detective McCoy had had a partner with whom the juror had been romantically involved, and that McCoy had seen the juror "on occasion" when his partner picked her up after work. The former partner had been married at the time of his relationship with the juror. McCoy said that he had not seen the juror and his former partner together for two years. He also explained that during his testimony he did not see the juror sitting in the jury box until he was leaving the witness stand, at which time she "just smiled" at him. Finally, McCoy said that on the day after his testimony, the juror had called his office and asked for his former partner. When McCoy responded by asking if the jury was still deliberating, she hung up.

Following the *voir dire*, counsel for both appellants moved for a mistrial. The court denied their motions.

## II

■ The prosecutor's failure to name Detective McCoy as a potential government witness on the first day of *voir dire*, when the juror who knew Detective McCoy was chosen, prejudiced appellants by preventing them from exposing possible juror bias and selecting an impartial jury by the use of peremptory challenges. The trial court's failure to grant appellants' mistrial motion because of this prejudice was an error that requires reversal of both appellants' convictions.

The Supreme Court said nearly one hundred years ago that the right to strike jurors without cause is "one of the most important rights secured to the accused.... Any system for the empanelling of a jury that prevents or embarrasses the full, unrestricted exercise by the accused of that right, must be condemned." *Pointer v. United States,* 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894). Although the right to peremptory challenges is not specifically guaranteed by the Constitution, it has long been "regarded as necessary to a fair and impartial trial." *Wells v. United States,* 515 A.2d 1108, 1110 n. 1 (D.C.1986).[9] That this right has special significance is reflected in our holding in *Wells* that if the right is denied or impaired in a criminal case, "the defendant need not demonstrate prejudice to obtain reversal of a conviction." *Id.* at 1111 (citations omitted); *accord, Williams v. United States,* 552 A.2d 510, 512 (D.C.1988). The omission of Detective McCoy's name from the list of witnesses that the prosecutor recited on the first day of jury selection made it impossible for appellants to exercise their right of peremptory challenge against the juror who knew McCoy.[10] Ap-

---

9. *Accord, Cash v. United States,* 553 A.2d 215, 217 (D.C.1989) ("One of the primary goals of peremptory challenges is to assure the trial's impartiality"); *see Boertje v. United States,* 569 A.2d 586, 592 (D.C.1989) (*voir dire* of prospective jurors "serves to assure an accused, as far as possible, an impartial jury by exposing any jury biases that might affect the verdict"); *Murray v. United States,* 532 A.2d 120, 123 (D.C. 1987) ("The primary duty of the courts in the *voir dire* is to discover those jurors who must be dismissed for cause ... and 'to permit counsel to satisfy themselves that they have an impartial jury'") (citations omitted)).

10. It is worth noting that appellants did not use all of their peremptory challenges, so that either of them could have struck the tainted juror if the taint had been revealed during the *voir dire*. Indeed, appellant Lyons asserts in his brief, in an argument adopted by appellant Cooper:

> From the pattern of peremptory challenges exercised, it appears certain that the defense would have stricken [the juror] had they known she was acquainted with a potential government witness. On the [first day of *voir dire* ], three jurors said they recognized police officers from the group of potential government witnesses; all three were stricken—one for cause and two through peremptory challenges.

Given the record before us and this specific claim by both appellants, we cannot conclude that the defense "would not have exercised its ... peremptory challenge if this juror's recognition of [McCoy] had been disclosed during *voir*

pellants make no claim that the prosecutor deliberately, or in bad faith, failed to mention McCoy's name at the critical time during the *voir dire*, nor is there any basis in the record for believing that his failure was anything other than inadvertent. Nevertheless, the omission was his, and thus the government must suffer the consequences on appeal.

■ The preferable cure for this violation of appellants' peremptory challenge right would have been to exclude the tainted juror from the panel before the start of jury deliberations. Unfortunately, since the judge did not learn of the connection between the juror and McCoy until after deliberations had begun, his only option at that point was to grant the defense motion for a mistrial. The denial of that motion now requires us to reverse the convictions and remand for a new trial. *Swain v. Alabama*, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965) ("The denial or impairment of the right [to peremptory challenge] is reversible error"), *overruled in part on other grounds in Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Williams v. United States, supra.*[11]

Appellant Cooper claims error in two portions of the jury instructions. In view of our reversal on other grounds, we need not consider these claims. We do, however, address certain other issues raised by both appellants, since one of them must be decided before Cooper can be retried (see note 16, *infra*), and the others will recur in a retrial. To those issues we now turn.

### III

■ Appellants contend that the trial judge erred in admitting into evidence the decedent's statement that "T–Bone told

them to shoot me."[12] The judge ruled that the statement was admissible under the spontaneous utterance and dying declaration exceptions to the hearsay rule. This ruling was correct on both grounds.

■ There are three prerequisites to the admission of a statement under the spontaneous utterance exception to the hearsay rule:

(1) the presence of a serious occurrence which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances, which in their totality suggest spontaneity and sincerity of the remark.

*Nicholson v. United States*, 368 A.2d 561, 564 (D.C.1977) (citation omitted). The admissibility of a spontaneous utterance "is committed to the sound judicial discretion of the trial court. We will reverse on appeal only if a ruling is clearly erroneous." *Alston v. United States*, 462 A.2d 1122, 1128 (D.C.1983) (citations omitted). Appellants claim that Royster's statement about T–Bone was not a spontaneous utterance because Royster "had time to reflect, premeditate, and construct" it. We are satisfied that the statement met all three requirements for admission as a spontaneous utterance.

First of all, the shooting was a "serious occurrence" that produced a state of "physical shock" in Royster. Ms. Flaherty testified that when she came to Royster's assistance, he was groaning and in pain. She saw that Royster had been shot in the chest, and that although the wound "wasn't bleeding a lot outside ... it was a

---

*dire." Shannon & Luchs Management Co. v. Roberts*, 447 A.2d 37, 44 (D.C.1982).

**11.** The hearing that the court conducted after learning that McCoy had recognized the juror was sufficient for the limited purpose of determining whether the telephone call between the two was evidence of the juror's bias or might have engendered bias. However, it did not focus on what we view as the crucial problem in this case: the impairment of appellants' right of

peremptory challenge resulting from the belated discovery of the relationship between the juror and McCoy.

**12.** "T–Bone" is the nickname of appellant Lyons. The statement was heard by Karen Flaherty, a woman who worked near the scene of the shooting and came to Royster's assistance after he was shot.

good hole there." This injury plainly fits within the types of situations which this court has recognized as "serious occurrences." *See Gayden v. United States,* 584 A.2d 578, 585 (D.C.1990) (admission of spontaneous utterance upheld when the declarant had been shot six times and was "rolling on a doorstep in extreme pain"), *cert. denied,* —— U.S. ——, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991); *Young v. United States,* 391 A.2d 248, 250 (D.C.1978) (declarant had been stabbed and was bleeding profusely); *Nicholson v. United States, supra,* 368 A.2d at 564 (declarant had been stabbed thirty minutes before making statement). Second, Flaherty stated that no more than ten minutes passed between the firing of the shots and Royster's statement; thus the statement came "within a reasonably short period" after the shooting. *See Alston v. United States, supra,* 462 A.2d at 1127 ("when the utterance is made immediately after the disturbing incident ... or a few minutes after the incident," it fits within the spontaneous utterance exception) (citations omitted)). Finally, the circumstances "in their totality suggest spontaneity and sincerity." Contrary to Lyons' assertion, there was no significant interval in which Royster "was fully conscious" and "had time to think and speculate." Rather, the testimony showed that in the short time between being shot and making the statement Royster was in great pain, and his condition was quickly deteriorating. The fact that Royster made the statement in response to a question from Ms. Flaherty is not proof that he reflected before speaking. *Young v. United States, supra,* 391 A.2d at 250.

█ It also was not erroneous for the trial court to admit the statement under the dying declaration exception to the hearsay rule. "To make out a dying declaration, the declarant must have spoken without hope of recovery and in the shadow of impending death." *Shepard v. United States,* 290 U.S. 96, 99, 54 S.Ct. 22, 24, 78 L.Ed. 196 (1933). The record supports the trial court's conclusion, well founded in the evidence, that Royster realized his "extreme circumstances even though [he did not] articulate" them. *See McFadden v. United States,* 395 A.2d 14, 16 (D.C.1978) ("The court can infer the victim's sense of impending death from the circumstances—from the nature and extent of his wounds").[13]

For these reasons, we find no error in the admission of Royster's statement.

### IV

█ Appellants argue that they were substantially prejudiced because the trial judge refused to permit two of the government's witnesses to invoke their Fifth Amendment privilege against self-incrimination. The judge found that both witnesses had waived the privilege by testifying before the grand jury. Appellants acknowledge the rule that a defendant in a criminal proceeding normally does not have standing to assert the constitutional rights of others. *Alderman v. United States,* 394 U.S. 165, 171–176, 89 S.Ct. 961, 965–68, 22 L.Ed.2d 176 (1969). More specifically, a defendant does not have standing to complain of an erroneous ruling on a witness' claim of privilege. *Long v. United States,* 124 U.S.App.D.C. 14, 19, 360 F.2d 829, 834 (1966), citing *Bowman v. United States,* 350 F.2d 913, 916 (9th Cir.1965) ("Where the witness is not the party, the party may not claim the privilege nor take advantage of an error of the court in overruling it"), *cert. denied,* 383 U.S. 950, 86 S.Ct. 1209, 16 L.Ed.2d 212 (1966). Appellants argue, however, that this case fits within the exception to this principle announced in *Ellis v. United States,* 135 U.S.App.D.C. 35, 416 F.2d 791 (1969).

█ In *Ellis* the court held:

13. The Supreme Court said in *Shepard v. United States, supra,* that the perception of impending death "must be exhibited in the evidence, and not left to conjecture." 290 U.S. at 100, 54 S.Ct. at 24. Of particular relevance on this point was testimony about Royster's own awareness of his condition. When Ms. Flaherty first approached Royster, a police officer was already on the scene, and they both attempted to move Royster. Flaherty testified, "When we talked to him about moving, he kind of went 'Oh, no,'" and he groaned. The officer testified that Royster said, "Don't move me. I have been shot too many times."

[A] witness who voluntarily testifies before a grand jury without invoking his privilege against self-incrimination, of which he has been advised, waives his privilege and may not thereafter claim it when he is called to testify as a witness at the trial on the indictment returned by the grand jury where the witness is not the defendant, or under indictment.

*Id.* at 44, 416 F.2d at 800. We have previously applied this rule in *Salim v. United States*, 480 A.2d 710, 714 (D.C.1984), and now reaffirm it. *Ellis* also recognizes, however, that there is an exception to this general rule. The *Ellis* court declared that when a judge erroneously overrules a witness' claim of privilege, " 'the reasons which underlie our rule denying standing to raise another's rights ... are outweighed by the need to protect ... fundamental rights....' " 135 U.S.App.D.C. at 43, 416 F.2d at 799, quoting *Barrows v. Jackson*, 346 U.S. 249, 257, 73 S.Ct. 1031, 1035, 97 L.Ed. 1586 (1953). "[A] defendant adversely affected in fact has standing to bring such departure from the judicial province to the appellate court for review and correction." *Ellis, supra,* 135 U.S.App.D.C. at 44, 416 F.2d at 800.

■ We hold that the *Ellis* exception is inapplicable in the instant case because there was no erroneous ruling on the Fifth Amendment waiver issue. The trial judge conducted a lengthy *voir dire* of the two witnesses in question and reviewed their grand jury testimony in order to determine the validity and scope of their waivers.[14] He then made specific findings of fact and ruled that each of them had knowingly and voluntarily waived his privilege. Because that ruling is amply supported by the evidence, we can find no error in the judge's refusal to sustain the witnesses' claim of privilege at trial. The *Ellis* exception therefore does not apply.

**V**

Lyons argues that his Sixth Amendment right to a speedy trial was violated by the fifteen-month delay between his arrest and the start of the trial. He claims that he was prejudiced by this delay because someone named "Chester" had died "while the case was pending." Lyons asserts that Chester would have rebutted the testimony of three government witnesses who testified about certain incriminating statements he had made.

■ Because the delay was more than a year, the speedy trial claim has *prima facie* merit so as to trigger an inquiry into the other relevant factors: the reasons for the delay, the defendant's assertion of his Sixth Amendment right, and—most importantly—prejudice to the defense. *Tribble v. United States*, 447 A.2d 766, 768 (D.C.1982). Nine of the fifteen months were consumed by the presentation of the case to the grand jury. This type of "investigative delay" has been characterized as "fundamentally unlike delay undertaken by the government solely to gain tactical advantage over the accused." *Tolliver v. United States*, 378 A.2d 679, 681 (D.C.1977). Moreover, "[a]n immediate ... indictment might impair the prosecutor's ability to continue the investigation or obtain additional indictments...." *Id.* The record plainly shows that this was a difficult and complex case (the trial lasted three weeks and involved twenty-five witnesses), and there is nothing to indicate that the government dragged its feet in conducting the grand jury proceedings. To the contrary, the trial judge stated that before the filing of the indictment he had called upon the prosecutor "to make periodic justifications for that grand jury delay, and I found each time he did so ... that he had demonstrated justification in some sense for the delay." The judge further characterized the delay from indictment to

---

14. In deciding whether a witness who has testified at an earlier proceeding may later assert a Fifth Amendment privilege, "a proper consideration of all the circumstances require[s] the trial judge to examine the grand jury testimony and to conduct a voir dire of the [witness] outside the presence of the jury." *Salim v. United States, supra,* 480 A.2d at 715. "In evaluating the validity of a witness' claim of the Fifth Amendment privilege, the trial court must determine, from all the circumstances, whether the claimant has reasonable cause to apprehend a real danger of prosecution." *Reese v. United States*, 467 A.2d 152, 156–157 (D.C.1983).

trial as "regrettable," but there is ample authority that such delay, while chargeable to the government, is considered more "neutral" and is "weighted less heavily" against the government. *Barker v. Wingo,* 407 U.S. 514, 531, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972).

Lyons was arrested in this case on June 17, 1987, and the next day he was ordered held on a $25,000 surety bond. On June 24 he filed a motion for review of conditions of release in which he "request[ed] a speedy trial" and, in one conclusory sentence, asserted "continuing prejudice to himself and his defense because of his incarceration." After gaining his release on July 21, however, he did not say anything more about a speedy trial until almost a year later, in a motion to dismiss for lack of a speedy trial filed July 15, 1988. The trial judge found it "most telling [that] once Mr. Lyons got out, there were no subsequent assertions [of his Sixth Amendment right] until the eve of trial." [15] He therefore declined to give "strong evidentiary weight" to this factor, and so do we, particularly in light of Lyons' failure to move for a prompt trial as an alternative to dismissal. *See Graves v. United States,* 490 A.2d 1086, 1098–1101 (D.C.1984) (en banc), *cert. denied,* 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986).

Finally, we can discern no prejudice to the defense resulting from the pre-trial delay. Lyons has not shown how the death of Chester prejudiced his defense, nor can we identify any prejudice from the record. *Parks v. United States,* 451 A.2d 591, 600 (D.C.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983). There is no evidence indicating who Chester was, when he died, or what his testimony would have been. Thus it is unclear whether the pre-trial delay in fact prevented Chester from testifying. There is also no proffer of how Chester would have rebutted the testimony of any government witnesses. Lyons did not suffer oppressive pre-trial

incarceration; he was incarcerated for only thirty-four days out of the fifteen months between his arrest and the start of the trial. Given the vagueness of his claim of prejudice, the lack of any prejudice revealed by the record, and Lyons' relatively brief incarceration, we hold that the trial court did not err in denying his motion to dismiss for lack of a speedy trial.

## VI

■ Finally, appellant Cooper challenges the sufficiency of the evidence to support her murder conviction as an aider and abettor. In considering any claim of evidentiary insufficiency, we must view the evidence in the light most favorable to the government, bearing in mind the jury's right to determine the credibility of witnesses and draw reasonable inferences from the evidence. *United States v. Hubbard,* 429 A.2d 1334, 1337–1338 (D.C.) (citing cases), *cert. denied,* 454 U.S. 857, 102 S.Ct. 308, 70 L.Ed.2d 153 (1981); *Byrd v. United States,* 388 A.2d 1225, 1229 (D.C. 1978) (citing cases). We recognize no distinction between direct and circumstantial evidence. *Franey v. United States,* 382 A.2d 1019, 1023 (D.C.1978) (citing cases); *see Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 138, 99 L.Ed. 150 (1954). Applying these venerable principles to the case at bar, we hold that the evidence was sufficient to prove beyond a reasonable doubt that Cooper was guilty of murder. [16]

"One who aids and abets another in committing a criminal offense is chargeable as a principal for all acts committed 'in furtherance of the common purpose, if the act done either is within the scope of that purpose, or is the natural or probable consequence of the act intended.'" *West v. United States,* 499 A.2d 860, 865 (D.C. 1985) (citation omitted). "[P]roof of presence at the scene of a crime plus conduct which designedly encourages or facilitates a crime will support an inference of guilty

---

15. Trial began on September 8, 1988.

16. We are obliged to address Cooper's sufficiency argument because, if the evidence were insufficient, the Double Jeopardy Clause would bar

her retrial. *Richardson v. United States,* 468 U.S. 317, 325, 104 S.Ct. 3081, 3086, 82 L.Ed.2d 242 (1984); *Burks v. United States,* 437 U.S. 1, 18, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978).

participation in the crime as an aider and abettor." *Jefferson v. United States*, 463 A.2d 681, 683 (D.C.1983).

■ The evidence showed that Cooper and Lyons shared a common purpose: to kill Royster in retaliation for stealing cocaine from them and their sellers. In the two months before the shooting, Cooper twice threatened Royster, saying that she would "pay somebody to kill" him and would "shoot [him] now" for having stolen cocaine. Five days before Royster's shooting, Cooper told Larry Jackson, a friend of Royster, that "we would shoot" Royster if he came back to the North Capitol Street neighborhood. On the day of the shooting, a witness saw Cooper walking past, saying to herself that she was "tired of this shit." Minutes later the same witness saw Roy, Cooper, and Lyons together, and he heard Cooper and Lyons arguing with Royster. In Cooper's presence, Lyons said to Royster, "I'm tired of this shit and it's ending now." [17] Roy shot Royster very soon after this argument took place. In the interim, Roy told Derrick Wimple to "go get the pistol," and he saw Wimple receive the gun from Cooper. The jury could reasonably infer that when Cooper handed Wimple the gun, she knew that Roy intended to shoot Royster. With that knowledge, she also took the gun back after Royster had been shot. From all of this evidence—most significantly, from the fact that she furnished the murder weapon to the triggerman—a jury could readily find that she aided and abetted the murder.

## VII

The convictions of both appellants are reversed, and this case is remanded for a new trial.

*Reversed and remanded.*

---

[17]. A reasonable juror could infer, from all the evidence, that what Cooper was "tired of" was the difficulties with Royster. Lyons' statement that "it's ending now" bespeaks an intention to bring the matter to an end; a reasonable juror could infer that the shooting was the planned means of doing so, and that Cooper shared in that plan.