Michael E. BOONE and Harold A. Stone, Appellants,

v.

UNITED STATES, Appellee.

Nos. 96–CF–1047, 96–CF–1097.

District of Columbia Court of Appeals.

Argued Sept. 16, 1999.
Decided March 29, 2001.

M. Elizabeth Kent, Washington, DC, appointed by the court, for appellant Boone. Michael E. Boone also filed a supplemental brief pro se.

Matthew C. Leefer, Boonsboro, MD, appointed by the court, for appellant Stone.

Barton A. Aronson, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Elizabeth Trosman, and Lynn C. Leibovitz, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, FARRELL, and GLICKMAN, Associate Judges.

TERRY, Associate Judge:

After a jury trial, both appellants were convicted of first-degree murder while armed and two related firearms offenses. The charges arose from the murder of Carlos Kemper in the early morning hours of December 20, 1992. In these consolidated appeals, appellants contend: (1) that the trial court abused its discretion by admitting evidence of other crimes and by denying appellant Stone's motion for severance; (2) that the government failed to disclose *Brady* material [1] early enough to enable the defense to make effective use of it; (3) that the court violated appellant Boone's Sixth Amendment right to confront witnesses; and (4) that the court erred in failing to give a limiting instruction concerning certain hearsay testimony. We reject all of these arguments and affirm all of the convictions.

I

A.  *The Government's Evidence*

Rufus Mayfield, a crack cocaine dealer who worked primarily in the 1500 block of

---

1.  *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Seventh Street, N.W., testified that he and both appellants were members of a drug syndicate known as "1512." According to Mr. Mayfield, Ronald "Poo" Nicholes was "the man that people purchased the drugs from" and was the principal supplier of crack for the enterprise. Mayfield also testified that in addition to selling crack for Nicholes, both appellants acted as enforcers for the 1512 organization. "As enforcers ... if somebody else came there and tried to hustle or started a beef or something, they were the ones that were going to take care of it."

At approximately 1:00 a.m. on December 20, 1992, Ronald Nicholes and his girl friend, Sophia Wright, were having a conversation outside 1516 Seventh Street. As they were chatting, a man with "a black mask over his face with his eyes showing" started to walk past the couple and then suddenly grabbed Ms. Wright, placing a gun against her back. The gunman forced Nicholes and Wright into a nearby parking lot, then took their money and told them to run. Ms. Wright testified that during the course of the robbery the assailant's mask slipped off, and when it did, she recognized his face. Although she could not recall his name, Ms. Wright said she had seen him with appellant Boone earlier that week in the Seventh Street area.

After the robbery, Ms. Wright and Mr. Nicholes went to the front of 1512 Seventh Street. A crowd of about eight people, including both appellants, also gathered there to discuss the incident. According to Ms. Wright, a man named Norris, who had witnessed the robbery from across the street, identified the masked gunman as Carlos Kemper and stated that he had been seen earlier with Boone and Stone. Mr. Nicholes testified that Norris told him that it was Carlos who had robbed him and that Boone had "set that up." Nicholes, not knowing what to believe, retreated with Boone and Stone to the hallway of a building to discuss the accusations away from the crowd. In private, Boone denied being involved in the robbery and told Nicholes, "If you pay me, I'll go kill [Carlos] for you...." Apparently, Boone was upset about being accused of assisting in the robbery and "wanted to prove that he [had] nothing to do with it." Upon hearing this, Stone said, "I don't like [Carlos] anyway, I'll kill him." Nicholes then agreed to pay Boone $500 to kill Carlos; Stone added that he would "do it for free."[2] Boone then removed a nine-millimeter pistol from his waistband, inspected its clip, and returned it to his waistband. Stone, however, did not have a gun with him and left to get one.

Approximately forty-five minutes later, Boone and Stone lured Carlos Kemper to the house at 1512 Seventh Street in order to execute their plan. Mayfield testified that Boone and Stone told Kemper that Nicholes "was going to kill him for robbing him," but that the three of them would kill Nicholes instead before Nicholes had a chance to act. The three men—all armed—then left the house and went out into the alley behind the building. According to Mayfield, once the three were together in the alley, Boone took Kemper's gun and shot him in the stomach. When Kemper turned and started to run, Stone shot him in the back. Kemper fell to the ground. Boone later told Mayfield that Stone then "stood on top of [Kemper] and

2. Mr. Mayfield testified that approximately two days after Carlos Kemper was murdered, he had a conversation with Boone and Stone in which Boone described how the two of them had killed Carlos. During the course of this conversation, Boone told Mayfield that Carlos had robbed Nicholes earlier that evening and that Boone "was going to take care of that ... if [Nicholes] paid him."

started shooting him."[3] Ms. Wright testified that she heard gunshots at about this time and that she and Nicholes then drove away in a car.[4]

Over the next few days, Boone and Stone revealed various details of the shooting to three different people: Mayfield, Nicholes, and Durrell Wheeler. Some time thereafter, Nicholes paid Boone $300 of the $500 he had promised him for the murder.

According to Mayfield, the weapon used by Stone to shoot Kemper was a Glock nine-millimeter pistol which he had obtained from Mayfield in an exchange a couple of weeks earlier. Within a week or two after the murder, Stone returned the gun to Mayfield, who in turn sold it to Nicholes for a half-ounce of crack cocaine.[5] Later, however, Mayfield went back to Nicholes with Anthony Irving, who demanded and received the weapon from Nicholes. According to Mayfield, Irving "told [Nicholes] that that was his gun" and that he wanted it back.

### B. *The Defense Evidence*

Maurice Wilkes testified that he had been gambling with Stone, Boone, and others at 1514 Seventh Street when they learned that Nicholes had been robbed. According to Wilkes, after learning the news, he and his companions simply resumed their gambling with no discussion of Carlos Kemper or of any "set-up." Adrian Green testified that he told Boone the next day that Kemper had been murdered. Ac-

cording to Green, Boone "was very upset and started crying" when he heard the news. Lorren Leadmon, a detective with the Metropolitan Police, testified that Nicholes told him that on December 20, shortly before the shooting, Boone "didn't have a gun, he had to go get one." Anthony Irving denied having had a conversation with Nicholes after the shooting and denied obtaining a gun from him. Finally, Danette Wade testified that she was in Stone's presence before and during the early morning hours of December 20. When she heard gunshots, Stone, who had been walking with her, suddenly ran down the street. She said she did not hear any conversations among Stone, Boone, and Nicholes about any plan to kill Kemper.

Neither Stone nor Boone testified.

## II

### A. *"Other Crimes" Evidence*

Appellants argue that the trial court erred in admitting testimony that they both had been involved in Nicholes' drug distributing enterprise before the night of the shooting and that both had acted as enforcers for this operation. Prior to trial, the government gave notice of its intention to present evidence that both Boone and Stone regularly sold crack cocaine, armed themselves with firearms, and served as enforcers for Nicholes' drug business, and that Stone had borrowed a Glock semi-automatic pistol approximately two weeks before the murder and also had it in his possession after the murder. In support

---

**3.** Durrell Wheeler testified that Stone later said he was smoking a marijuana cigarette as he fired the shots at Kemper, and that "every time I shot him, I puffed." According to Wheeler, Stone was laughing as he told the story.

**4.** Nicholes testified that approximately forty-five minutes after Boone and Stone agreed to kill Carlos, "Michael Boone come out from a

lot across the street that faced 1512. And when he come out of the lot, he come over there to me and said, Poo, I got Carlos in the alley. He said, you want me to kill him? And I said no. He said, no, I'm going to do it, that's what you're paying me for."

**5.** Mayfield did not want to keep the gun because he "knew it had a body on it."

of its position that such evidence was admissible, the government argued that it was relevant to prove motive. The trial court agreed and allowed the evidence to be admitted.

■ Although proof that a defendant has committed other criminal acts independent of the crime charged is generally inadmissible, one of the main exceptions to that rule is that "[e]vidence of other crimes is admissible when relevant to . . . motive. . . ." *Drew v. United States,* 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (1964); *accord, e.g., Daniels v. United States,* 613 A.2d 342, 345–346 (D.C.1992). When such evidence is offered, the court must balance its probative value against the risk of unfair prejudice that it poses, applying the standard set forth in FED. R.EVID. 403. If the court concludes that the balance favors admission, its ruling to that effect is reviewed only for abuse of discretion. *See Johnson v. United States,* 683 A.2d 1087, 1095 (D.C.1996) (en banc), *cert. denied,* 520 U.S. 1148, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997);[6] *Parker v. United States,* 586 A.2d 720, 724 (D.C.1991); *Wooten v. United States,* 285 A.2d 308, 309 (D.C.1971). In this case we are satisfied that the trial court did not abuse its discretion in allowing the jury to hear the challenged evidence.

■ The trial court reasonably could, and did, conclude that the testimony about appellants' involvement as enforcers in the drug organization was not offered to prove their predisposition to commit the charged homicide. To begin with, the evidence

showed that after the robbery Boone was accused of setting up Nicholes, and that both Boone and Stone offered to kill Kemper in order to vindicate themselves and prove their loyalty to Nicholes. Rufus Mayfield testified that as enforcers for the organization, and thus for its leader Nicholes, appellants' duty was to "take care of" anyone "who came there [to 1512 Seventh Street] and tried to hustle or started a beef or something. . . ." That was precisely what Kemper did on December 20, 1992, thereby triggering appellants' duties as enforcers. As the trial court explained:

Is it more prejudicial than probative? Not in light of the *Daniels* case and the *Johnson* case. There are jurors, and I suspect many of them, but there are certainly some jurors who haven't the slightest idea what goes on on the street. They just have no idea of the degree to which one person will kill another over proving loyalty. What we might take for granted because we have heard story after story, I don't think a jury would begin to understand, that just to prove that you didn't set somebody up for a robbery would cause you or motivate you to shoot somebody in cold blood. It is not something I think the average jury could understand, juror could understand.

And so motive, that is, explanation for what prompts this kind of violence, if the jury believes the government's evidence, becomes important. . . . And more probative than prejudicial.

---

**6.** Contrary to appellants' belief, this court's decision in *Johnson* did not lower the standard for admission of *Drew* evidence but merely clarified it. We noted that because there had been an apparent lack of consistency in cases in which *Drew* was applicable and those in which it was not, "we take this opportunity to clarify that, regarding the admission of evidence generally, this jurisdic-

tion will follow the policy set forth in Federal Rule of Evidence 403—'evidence [otherwise relevant] may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . .,' and will apply that policy in the other crimes context as well." *Johnson,* 683 A.2d at 1099 (footnote omitted).

As the government points out in its brief, "evidence of drug-related activity is routinely admitted when it provides motive and context for other crimes, including homicide." For example, in *Jackson v. United States*, 329 A.2d 782 (D.C.1974), proof that the defendant was a distributor of drugs was held admissible to "prove that a motive for the shooting was a desire to eliminate a weak link in a drug distribution chain," *id.* at 790, "and was also admissible on the question of Jackson's motive to avenge his friend's shooting." *Id.* at 790 n. 16.[7] Likewise in *Daniels*, cited by the trial court in its ruling, we upheld the admission of evidence that the defendants had been involved in drug trafficking because, "without such evidence, the shooting could have made little sense to the jury, in light of what might have been seen as the otherwise incomplete and confusing facts of the case." 613 A.2d at 348. We think the trial court sufficiently weighed all the relevant factors in ruling that the challenged evidence was admissible.

█ Nor did the court err in determining that the probative value of the evidence outweighed the danger of unfair prejudice. The case was tried on the theory that appellants' motive for the murder was their desire to show Nicholes that they were loyal enforcers in his drug operation. Without the challenged evidence, the jury would have heard only that one man's (Norris') allegations of deceit and disloyalty prompted two men to commit a murder. In addition, most of the witnesses, who were themselves convicted felons and drug dealers, testified that appellants were also engaged in the drug trade. Mindful of the potential prejudice, the trial court specifically restricted the government by limiting its inquiries "to a very

short period of time before the offense." The evaluation and weighing of evidence for such prejudice is "quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision." *Johnson*, 683 A.2d at 1095. Viewing the whole record, we see no reason to abandon that deference or to second-guess the trial judge's ruling.

### B. *The Motion for Severance*

Appellant Stone contends that the trial court abused its discretion in denying his motion for a separate trial under Super.Ct.Crim.R. 14. Specifically, Stone argues that he was impermissibly prejudiced when his counsel's cross-examination of Rufus Mayfield, a government witness, was curtailed as an accommodation to his co-defendant Boone. In a previous case, Mayfield and Boone had been jointly charged with burglary in 1993. Mayfield entered into a plea agreement with the government and testified against Boone at that trial, which resulted in a conviction. In the present case, Stone's counsel wanted to impeach Mr. Mayfield by questioning him on cross-examination about "the full parameters of his agreement with the United States" and to demonstrate "the exposure that Mr. Mayfield potentially faced in the event he did not cooperate with the United States." Stone's counsel, anticipating objections from Boone, moved for a separate trial so that she could freely impeach Mayfield. The trial court denied the motion.

█ There is a long-standing presumption that defendants jointly charged with a criminal offense should be tried together. *E.g., Sterling v. United States*, 691 A.2d 126, 135 (D.C.1997). In such

---

7. The murder victim in *Jackson* had previously shot and wounded another man who was not only Jackson's friend but also one of the dealers in Jackson's drug distribution network.

circumstances a motion for severance under Rule 14 is committed to the sound discretion of the trial court. *Bright v. United States,* 698 A.2d 450, 454 (D.C. 1997); *Walker v. United States,* 630 A.2d 658, 663 (D.C.1993). This court will reverse the denial of such a motion only upon a clear showing of abuse of discretion. *Bright,* 698 A.2d at 454; *Parks v. United States,* 656 A.2d 1137, 1139 (D.C.), *cert. denied,* 516 U.S. 873, 116 S.Ct. 198, 133 L.Ed.2d 133 (1995). To meet his burden, a defendant "must show 'the most compelling prejudice' ... from which 'the court would be unable to afford protection' if both offenses were tried together." *Winestock v. United States,* 429 A.2d 519, 526 (D.C.1981) (citations omitted); *accord, e.g., Elliott v. United States,* 633 A.2d 27, 34–35 (D.C.1993) (defendant must show that "manifest prejudice" resulted from joinder). We can discern no prejudice on this record.

■ The trial court's denial of the severance motion did not preclude Stone from impeaching Mr. Mayfield. The court, cognizant of the potential problems that Mayfield's testimony presented for Boone, instructed Stone's counsel not to mention Boone's name when cross-examining Mayfield about the earlier case. *See Roundtree v. United States,* 581 A.2d 315, 323 (D.C.1990) (in exercising its discretion to determine the scope of cross-examination, a trial court may impose reasonable restrictions to avoid such problems as "harassment, prejudice, confusion of the issue, the witness' safety, or interrogation that is repetitive or only marginally relevant"). As the court remarked to Stone's counsel:

> [I]t still won't matter what the name of the person was. His co-defendant could have been Winfield [the judge's name]. It doesn't matter who he testified against. He had a co-defendant. He

made a deal with the Government. He testified against that co-defendant, whoever it was, and then maybe if no name is mentioned and that person was convicted, that is to say you did a good job for the Government and the person was convicted.

On cross-examination of Mr. Mayfield, Stone's counsel elicited testimony that he "agreed to testify against the co-defendants in that [earlier] case" in exchange for a reduced sentence. In addition, Mayfield admitted that as a result of his plea agreement he would be eligible for parole after six years and "expect[ed] to be out in a couple of years." Contrary to Stone's present assertions, little or no value would have been added to this testimony if Mr. Mayfield had been allowed to state that the co-defendant to whom he referred was actually Boone. The jury heard that he helped the government in exchange for leniency, which was the primary objective of Stone's counsel. It was then for the jury to decide whether to credit the testimony of such a "snitch." On this record we can find no abuse of discretion in the denial of Stone's motion for severance. *Winestock,* 429 A.2d at 526.

### C.  *The Brady Claims*

Both appellants contend that the government, in numerous respects, violated its obligations under *Brady v. Maryland, supra* note 1, to disclose material exculpatory evidence in time for the defense to make effective use of it at trial. Appellants argue, in particular, that they were unfairly prejudiced by the failure of the government to disclose (1) that Mr. Mayfield, not Mr. Stone, was the actual owner of the murder weapon; (2) that Mr. Nicholes and Mr. Wheeler also had possession of the murder weapon around the time of the murder; (3) that in 1995, as part of a plea agreement in an unrelated case, Ronald Nicholes had pleaded guilty in the United

States District Court for the District of Columbia to the murder of Carlos Kemper; and (4) that the 911 tape from the night of the murder indicated that the suspected shooters had fled from the scene in a brown car.

■■■■ Under *Brady* and its progeny, a defendant's right to due process is violated if the government withholds evidence that is material either to guilt or to punishment. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194; *see, e.g., James v. United States*, 580 A.2d 636, 644 (D.C.1990) (citing *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)).

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *accord, James*, 580 A.2d at 644 (citing *Bagley*). It is also "well settled that the prosecution must disclose exculpatory material 'at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case....'" *Edelen v. United States*, 627 A.2d 968, 970 (D.C.1993) (citation omitted); *accord, Sterling*, 691 A.2d at 134. Nevertheless, even if *Brady* evidence has not been timely disclosed (or has not been disclosed at all), reversal is warranted "only where there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Edelen*, 627 A.2d at 971 (citations omitted).

■■■■ In this case defense counsel apparently learned for the first time during Rufus Mayfield's direct testimony that the weapon used to kill Carlos Kemper had previously been in the possession of Mayfield and Wheeler. Stone's counsel argued that if she had known this fact earlier, she "would have spent or my investigator would have spent a considerable amount of time putting that gun in his hand for a lot longer period than he is now willing to admit.... [T]hat's why it's *Brady*." The only relief that counsel requested, however, was that the court order the government to disclose "what additional evidence it has in its possession regarding ownership of that weapon by Mr. Mayfield." After hearing from the government, the trial court apparently concluded that even if the evidence should have been disclosed under *Brady*, it would not have materially affected the verdict.[8]

Although defense counsel's pretrial preparation might have been different if they had known of the weapon's true owner and the subsequent exchanges, we agree with the trial court that the result of the proceeding would have been the same. On cross-examination Mayfield testified

---

8. We say "apparently" because it is not entirely clear whether the court actually ruled that this evidence should have been disclosed but that failure to disclose it did not materially affect the outcome of the trial, or whether the court concluded that it simply did not qualify as *Brady* material. What the court said was this:

> I am not at all persuaded that this information qualifies as *Brady* information that you may have wanted to know. It is not sufficient that you might have been able to use it. It is not sufficient to warrant a conclusion, but it is information that should have been provided to you under the *Brady* doctrine such that a failure would warrant sanctions. And so to the extent that you are seeking sanctions or information similar to this information under the *Brady* doctrine, the request for sanctions and additional information is denied.

Following this ruling, neither defense attorney made a motion for a continuance or a mistrial.

that the gun that killed Carlos Kemper was in his possession after the murder and was the same gun that he gave to Nicholes. In addition, both defense attorneys impeached Mr. Mayfield with his grand jury testimony, and Mayfield admitted that he had not told the grand jury that the gun Stone used to kill Kemper was his own. In fact, Boone's counsel read an excerpt from the grand jury proceedings into the record in which Mayfield had testified that the gun that Stone had in his possession on the night of the murder was Stone's own gun. Confronted with this testimony, Mayfield acknowledged that he had "deliberately misled the grand jury." Likewise, both Nicholes and Wheeler testified that they had each come into possession of the weapon after the murder.[9]

While it might have been prudent for the trial judge to grant a brief respite in the trial (had either counsel asked for one) in order to permit counsel to absorb the new information and to make strategic readjustments, the record reveals no prejudice resulting from the court's failure to do so. *See Edelen*, 627 A.2d at 972 (trial court has wide latitude in deciding whether to grant or deny a continuance); *Martin v. United States*, 606 A.2d 120, 132 (D.C. 1991) (same); *O'Connor v. United States*, 399 A.2d 21, 28 (D.C.1979) (same). Both defense attorneys effectively used the new information to impeach the government's witnesses and to weaken the government's case. As a result of excellent work by each attorney, the jury learned the critical facts, namely, that the gun used to kill Carlos Kemper was actually Mayfield's gun, and that after the murder the gun was traded to Nicholes. As Stone correctly notes in his brief, the government's case consisted almost entirely of testimony from "self-proclaimed" felons, drug dealers, and government snitches; nevertheless, the jury chose to believe those very witnesses. Accordingly, we are satisfied that the result of the trial would not have been different even if Mayfield's connection with the gun had been disclosed before he testified.

For many of the same reasons, appellants' other assertions of *Brady* violations are without merit. On the fourth day of trial, defense counsel made a preliminary *Brady* request for the radio run on the night of the shooting. It appears that two or three people reported the shooting to the police, and one of them made reference to a brown getaway car. When this fact came out, Boone's counsel complained, "This was the first time that we heard this. As a matter of fact, the car that supposedly the shooters got away in was a blue car, and we think *Brady* requires us to have the names of the people who called that in...." After reviewing the 911 tape, the prosecutor agreed that there was "a reference to a brown car," but it had no relationship to the shooting, and the individual who called it in "didn't leave a name, didn't leave an address, and didn't leave any information." In response to the court's questioning, the prosecutor stated that she was satisfied that the tape did not contain any *Brady* material. The court then said:

No doubt, if you had the information, you would have tried to use it, but that isn't the standard of *Brady*. *Brady* says that you have to have—for it to be discoverable, producible, information that suggests even exculpation, and the reference on the radio run is not that the car contained the people who committed the offense. At most, the car is the

---

9. Nicholes stated that after Kemper was murdered, Mayfield gave him a Glock nine-millimeter pistol in exchange for crack cocaine. Wheeler testified that when Stone told him how he had killed Carlos Kemper, the two of them "swapped guns."

same car seen leaving the scene of the area where the shooting took place, but nobody says in it were the perpetrators and, therefore, since it's brown and these guys left in a blue car, they didn't commit this offense. It's not that strong. . . .

To the extent that there has not been any *Brady* demand for further information resulting from a review of the audio tape, your request is denied. I just don't have a sufficient factual predicate to request further investigation by the government.

It is clear that the radio broadcast did not contain exculpatory information material to either appellant's guilt or punishment. On the contrary, the statements on the tape were vague and unlikely to have a significant effect on the result of the trial. At most, the tape indicates that after the shooting a number of people called to report the incident and that those who were in the area fled after hearing gunshots. We find it doubtful that the tape would have had much utility, if any, if the defense had had access to it before trial. Even on appeal, appellants offer no specific argument to show how the fact that a brown car was seen leaving the area of the murder was itself exculpatory. They merely rely on the notion that the failure of the prosecutor to disclose this information "was wrong [and] that the error was detrimental to the defense." That is not enough to persuade us that a different result was reasonably probable. *See Kyles v. Whitley,* 514 U.S. 419, 441, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375; *Farley v. United States,* 694 A.2d 887, 889 (D.C. 1997) (citing *Kyles* and *Bagley*).

■ Appellants also contend that the government failed to disclose in a timely manner that, as part of a 1995 plea agreement involving numerous narcotic charges,

Mr. Nicholes pleaded guilty in the United States District Court for the District of Columbia to the second-degree murder of Carlos Kemper. Boone maintains, in addition, that the government failed to make timely disclosure of the actual transcript of Nicholes' plea hearing. As to the plea agreement itself, the government recognized that it had an obligation to disclose this information to defense counsel and did so several days before Nicholes was subject to cross-examination. Appellants admit that they were aware that Nicholes had pleaded guilty to Kemper's murder, but not "until we had the Jencks material during the trial." Their *Brady* argument is simply that the Nicholes plea agreement "could have been used more effectively . . . if disclosed pretrial."

This court has rejected any notion that disclosure in accordance with the Jencks Act, 18 U.S.C. § 3500 (1994), satisfies the prosecutor's duty of seasonable disclosure under *Brady,* or even that if such disclosure is made, the burden may then be shifted to the defendant, under pain of waiver, to request a continuance or similar remedy. *See Edelen,* 627 A.2d at 970; *James,* 580 A.2d at 643-644. In the present case, however, even if we assume for the sake of argument that the government mischaracterized Nicholes' plea agreement as Jencks material and was in fact obliged under *Brady* to provide it in advance of trial, reversal based on its failure to do so would be warranted only if there were a reasonable probability that, had the disclosure been made earlier, the result of the proceeding would have been different. *Catlett v. United States,* 545 A.2d 1202, 1217 (D.C.1988) (citing *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375), *cert. denied,* 488 U.S. 1017, 109 S.Ct. 813, 102 L.Ed.2d 803 (1989).

Both defense attorneys cross-examined Mr. Nicholes and impeached him with the

plea agreement. It is difficult to imagine what additional use they could have made of it if it had been provided to them earlier. Moreover, this case does not appear to have been a close one. The prosecution's case at trial was presented through the testimony of six civilian witnesses and four police officers, as well as physical evidence and exhibits. The defense put on three witnesses who gave contrary accounts of the shooting. The physical and testimonial evidence was strong, and it does not appear to us that the jury's verdict depended to any significant extent on the credibility of Mr. Nicholes. We hold, accordingly, that appellants have failed to show how disclosure of this information before trial would have made a different result probable. *See Edelen,* 627 A.2d at 971 (no *Brady* violation when defendant could not demonstrate how earlier disclosure would have affected the outcome of the trial); *Frezzell v. United States,* 380 A.2d 1382, 1385 (D.C.1977) (in light of "overwhelming testimonial evidence," court was unable to conclude "that any exculpatory description of a witness who gave a name and address that could not be traced would have created reasonable doubt as to guilt").

As for the transcript of Mr. Nicholes' plea hearing, the standard for determining materiality, as *Bagley* makes clear, is the same whether or not the evidence at issue was specifically requested. *See* 473 U.S. at 682, 105 S.Ct. 3375. In this case, since neither appellant apparently was aware of the transcript and thus did not request it, the ultimate question, again, is whether the transcript was "material" to the outcome of the trial. *Id.* The portion of the transcript read into the record in no way exculpates either appellant, nor does the transcript contain any additional information that was not elicited during either the direct or the cross-examination of Mr. Nicholes. Thus appellants have again failed to show how disclosure of this information before trial would have made a different result reasonably probable.[10]

For the foregoing reasons, we find no basis for reversal in any asserted violation of the principles of *Brady v. Maryland.*

### D. *Boone's Sixth Amendment Claim*

Mr. Boone argues that his Sixth Amendment rights were violated by the manner in which the court accommodated the Fifth Amendment rights of James Bowe. When counsel for Boone announced (in the jury's absence) that Bowe would be the next defense witness, Bowe—through counsel—asserted his Fifth Amendment privilege on the ground that his three previous drug charges, two of which had been dismissed for lack of prosecution and the third dismissed without prejudice by the government, might be revived on the basis of his testimony in this case. Both the prosecutor and the court recognized that "the possibility of prosecution, however slim, is real." The parties agreed, however, after discussing potential problems, that Mr. Bowe could truthfully answer the prosecutor's questions on cross-examination with-

---

10. Boone also argues that the government's failure to disclose the details of Nicholes' plea agreement before trial violated Super.Ct.Crim.R. 16, which governs discovery in criminal cases. We reject this argument. As the government points out in its brief, "Rule 16 obligations are triggered only by requests," and in this case there is nothing in the record to show that either defense attorney made any request for discovery under Rule 16. Indeed, Boone's brief states only that defense counsel "*presumably* made all appropriate requests in informal pretrial discovery" (emphasis added). Rule 16, however, requires an *actual* request, and since the record does not establish that one was ever made, we have no basis for finding a Rule 16 violation.

out incriminating himself.[11] The prosecutor said, "The only thing I see that would be within the scope of proper cross-examination would be bias, and that would be limited to a direct connection to these two defendants." However, before the trial court could make a final decision on Bowe's claim of privilege, Boone's counsel told the court, "My client informs me that he does not want Mr. Bowe to testify." As a result, Bowe gave no testimony and was excused. The jury never heard him say a word.

■ Thus, as an initial matter, Boone waived his argument that his Sixth Amendment rights were violated by Bowe's failure to testify on his behalf. The issue before us is not, as Boone suggests, how to resolve the conflict between a defendant's Sixth Amendment right to call witnesses and the Fifth Amendment privilege of a particular witness. The record makes clear that the potential conflict between these two constitutional rights was rendered moot by Boone's voluntary decision not to put Bowe on the stand. Indeed, the court never even had an opportunity to make a final ruling on the matter.

■ In any event, the court was following the relevant case law in proceeding as it did. The right to call witnesses in one's own defense is an essential attribute of our adversary system, fundamental to a fair trial and basic to due process of law. *Taylor v. Illinois*, 484 U.S. 400, 407–409, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); *Wilson v. United States*, 558 A.2d 1135, 1140 (D.C.1989). But that right is not absolute. *Littlejohn v. United States*, 705 A.2d 1077, 1083 (D.C.1997). "[N]o [person] may vindicate his constitutional rights by requir-

ing another to forego his own." *Wilson*, 558 A.2d at 1140 (citation omitted).

> [A] criminal defendant's right to present witnesses in his own defense is a fundamental one.... Nevertheless, "in the crunch, when all else fails, the Fifth Amendment privilege of the witness prevails over the defendant's right to compel him to testify." ... "Because both rights are so precious ... and because a forced election is so painful, it is the responsibility of the trial judge to take all reasonable steps to avoid a direct collision."

*Harris v. United States*, 614 A.2d 1277, 1281–1282 (D.C.1992) (citing *Wilson*); accord, *Carter v. United States*, 684 A.2d 331, 336 (D.C.1996) (en banc) (adopting this quotation from *Harris* as a summary of "basic legal principles"). In this case, after the trial court and the government both recognized that there was at least a possibility that the charges against Mr. Bowe could be revived if he were to testify, the court directed the government to limit its cross-examination of the witness so as not to affect the privilege, and the government appeared willing to do so.

Boone argues nevertheless that at the time of his trial (a few months before *Carter* was decided), a witness had such a privilege only when the court determined that there was a "real and substantial" risk of prosecution. *See Wilson*, 558 A.2d at 1141. Consequently, he maintains that applying this court's decision in *Carter*, which lowered the standard from a "probability" to a "possibility" of prosecution in determining whether to uphold a witness' claim of a Fifth Amendment privilege, would

---

11. The trial court specifically asked the prosecutor, "Do you anticipate a question, under any circumstances, asking this man, were you out there selling drugs somewhere in the District of Columbia in and around the time of December 19, 1992?" The prosecutor answered, "No."

violate his due process rights. This contention is without merit for two reasons.

In the first place, "a 'new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases ... pending on direct review ... with no exception for cases in which the new rule constitutes a "clear break" with the past.'" *Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (citing *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)). More fundamentally, we agree with the government's observation in its brief that "nothing in this appeal hinges on this change" because the trial court never had a chance to decide (and did not decide) which standard—"probability" or "possibility"—to apply. It was in the process of deciding the issue, trying to "avoid a direct collision" between Boone's rights and Bowe's rights, as *Harris* and *Carter* dictate, when Boone chose to withdraw Bowe as a witness. While in some cases there might be a significant issue as to the applicable standard,[12] on the present record the issue evaporates. *Cf. Luce v. United States*, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984) (declining to consider claim that trial court erred in ruling that certain evidence would be admissible to impeach defendant if he testified, when defendant thereafter elected not to testify).[13]

Boone further argues that his Sixth Amendment rights were violated by the manner in which the court accommodated the Fifth Amendment rights of Dante Wade and Maurice Wilkes. But these were Stone's witnesses, not Boone's, and Stone has not joined in Boone's argument. We conclude that Boone has no standing to complain here about the manner in which the court dealt with Wade's and Wilkes' claims of privilege. *See United States v. Jones*, 44 F.3d 860, 873 (10th Cir.1995); *United States v. Partin*, 601 F.2d 1000, 1006 (9th Cir.1979), *cert. denied*, 446 U.S. 964, 100 S.Ct. 2939, 64 L.Ed.2d 822 (1980). In any event, Boone's counsel was free to confront these witness on cross-examination but instead chose to ask Wilkes only one question and refrained altogether from questioning Wade. The record thus fails to support Boone's argument regarding these two witnesses.

### E. Stone's Request for a Limiting Instruction

Mr. Stone argues that the testimony by Ms. Wright about Norris' statements following the robbery constituted evidence of other crimes committed by Stone and that, consequently, the admission of this evidence created the danger of jury misuse and the need for a limiting instruction. We think Stone has misapprehended the nature of the evidence at issue here and, consequently, the possibility of jury misuse of the evidence.

Sophia Wright testified that a man named Norris identified the man who robbed her and Nicholes as Carlos Kemper, not Stone or Boone. She then went on to say that Norris told her that Kemper had been seen with Stone and Boone earlier in the evening. At this point, Stone's counsel requested a limiting instruction, which the court declined to give. Since the testimony did not show that Stone was

---

**12.** *See United States v. Pardo*, 204 U.S.App. D.C. 263, 272–273, 636 F.2d 535, 544–545 (1980).

**13.** Boone also suggests, "secondarily and for the record," that applying the *Carter* standard retroactively would violate the Ex Post Facto Clause of the Constitution. We reject this suggestion. *See Collins v. Youngblood*, 497 U.S. 37, 43 n. 3, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990); *Jones v. United States*, 719 A.2d 92, 94 (D.C.1998).

the person who had engaged in other criminal activity—namely, the robbery of Nicholes and Wright—it was not "other crimes" evidence as that term is traditionally understood. *See Drew,* 118 U.S.App. D.C. at 15–16, 331 F.2d at 89–90. Merely being in the presence of someone who later commits a crime does not necessarily implicate a person in that crime.

Moreover, Ms. Wright's testimony was not true "other crimes" evidence because it was not introduced to prove that other crimes had actually been committed. *See Sweet v. United States,* 449 A.2d 315, 319 (D.C.1982). As Stone's counsel admitted at trial, the testimony was introduced only for the purpose of showing the effect that Norris' statement had upon Stone's state of mind. Nor did the government attempt to show that Stone was in any way involved in the robbery with Kemper.[14] There was thus no reason for the court to give a limiting instruction, especially when the jury would have had to engage in speculation to make any improper use of Ms. Wright's testimony.[15]

### III

The convictions of both appellants are accordingly

*Affirmed.*[16]

14. The trial court did give a limiting "other crimes" instruction in its general charge to the jury, but that was related to evidence concerning the distribution of drugs and possession of guns. This evidence, unlike Ms. Wright's testimony, was offered to show motive and intent and thus required a limiting instruction. *See Miles v. United States,* 374 A.2d 278, 283 (D.C.1977).

15. Finally, appellant Stone contends in his brief that the lenient plea agreements between the government and Messrs. Nicholes, May-

field, and Wheeler, which were made in exchange for their testimony in this case, rendered their testimony inadmissible. At oral argument, however, Stone wisely abandoned this contention in light of *United States v. Singleton,* 165 F.3d 1297 (10th Cir.) (en banc), *cert. denied,* 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999).

16. We have considered the additional arguments made in Boone's *pro se* brief and conclude that they are without merit.