Richard L. JONES, Appellant,

v.

UNITED STATES, Appellee.

No. 87–823.

District of Columbia Court of Appeals.

Submitted Sept. 27, 1989.
Decided Nov. 13, 1989.

James C. McGuire, appointed by this court, was on the brief, for appellant.

Jay B. Stephens, U.S. Atty., Michael W. Farrell, Asst. U.S. Atty. at the time the brief was filed, G. Paul Howes and Henry S. Hoberman, Asst. U.S. Attys., were on the brief, for appellee.

Before BELSON and TERRY, Associate Judges, and REILLY, Senior Judge.

REILLY, Senior Judge:

Richard Jones was convicted by a jury on three counts of armed robbery (D.C.Code §§ 22–2901, 22–3202 (1981)) and assault with intent to commit robbery while armed (D.C.Code §§ 22–501, 22–3202 (1989 Repl.)). On appeal he assigns as errors (a) denial of a motion to suppress grounded upon an arrest that was assertedly in violation of constitutional rights, (b) the trial court's refusal to compel testimony by a defense witness who had invoked his right against

self-incrimination, and (c) imposition of a prison sentence, which he says constituted cruel and unusual punishment. We affirm.[1]

According to government evidence, appellant and four acquaintances, who were planning to buy a wholesale quantity of cocaine for distribution and needed a large amount of money to effectuate the purchase, decided to rob some retail establishment which was open at night. Driving around the city and an adjacent suburb in a stolen van supplied by appellant Jones and another accomplice, Ross, the gang, after reconnoitering a filling station and food outlet, was advised by Jones that an all night restaurant on upper Wisconsin Avenue was the place to hit. He entered the restaurant shortly before midnight, and pretending to be responding to a "Help Wanted" sign, filled out a job application while surveying the scene. While he was still inside the restaurant, two other members of the gang, Ramos and Thillet, followed him, sat at the counter, and ordered coffee. All three then returned to the van, drove downtown with the others and made some arrangements with a friend of theirs, which enabled them to pick up a handgun some two or three hours later from an apartment in the Adams–Morgan area. Armed with this weapon, they drove back to the vicinity of the restaurant and parked the van a block or two away. By that time it was 4:00 a.m.

Ramos, Thillet, and a third man, Soto, who was in possession of the gun, then left the van to carry out the robbery. Knocking over the cashier-waitress, they grabbed some $350 from the cash register and also obtained an additional $150 by forcing the manager and customers at gunpoint to turn over their cash and wallets. Placing the cash into a paper bag, the trio then rejoined their friends in the van. Ross, who was at the wheel with Ramos beside him in the front seat, drove east to Connecticut Avenue where he turned south and passed a police patrol car going in the opposite direction. At that time, Connecticut Avenue was almost deserted, which enabled Officer Adams to observe from the police car that one occupant in the slow moving van was wearing a white cap with a Playboy emblem.

A minute or two later, Adams heard a radio broadcast reporting the robbery. It instructed all police to be on the lookout for two Spanish males, one of whom was wearing the distinctive kind of cap the officer had just seen. The police car made a U-turn and set out to overtake the van. Meanwhile, Officer McInerney, on patrol many blocks further south on Connecticut Avenue, was alerted by the same broadcast. Realizing that one of the few escape routes across Rock Creek Park from Wisconsin Avenue for any getaway vehicle was by way of Porter Street, he drove north and stationed his car at the intersection of Connecticut and Porter. As a van approached and turned left in front of him, he noticed a white cap on the head of the front seat passenger. He pursued the van down Porter Street, signalled it to a halt near the Klingle Road overpass, walked back and discovered that the white cap he had seen the passenger (later identified as Ramos) wearing did indeed bear the Playboy logo. Transmitting a call for back-up assistance, the Adams car responded. The officers then ushered the occupants of the van into the patrol cars and took them back to the scene of the robbery for identification by the victims. A search of the van uncovered a handgun, wallets and a paper bag containing the currency stolen from the restaurant.

After indictments were returned against the occupants of the getaway van, three of them pleaded guilty to certain counts after

---

1. Appellant also argues that the trial court, in clarifying an instruction on aiding and abetting, used such broad language in defining these terms that the jury may not have been unanimous as to which particular actions by the accused amounted to such illegal conduct. This argument has no merit. It was not until this appeal was briefed that such argument was advanced. As neither party objected to the instructions at trial, our review of the matter is limited to plain error. *Carter v. United States,* 475 A.2d 1118, 1125 (D.C.1984). This belated contention fails to approach the threshold of plain error. *See Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977).

confessing to what they and their confederates had done on the night of the crime. A fourth (Soto) fled the jurisdiction, leaving appellant Jones, who had pleaded not guilty, to face trial alone.

Before trial, Jones filed a motion to suppress the evidence against him, which he contended was the result of an illegal stop of the van which led to his warrantless arrest and prosecution. This motion was denied after an evidentiary hearing. In appealing this ruling, he argues that McInerney had no justifiable reason for ordering the vehicle in which he was riding to stop and thereby enable that officer to check on its occupants and contents. It is of course fundamental that in order to justify an investigatory stop, the police officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" such a stop. *Lawrence v. United States*, 509 A.2d 614, 615 (D.C.1986), *citing Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). After conducting a full suppression hearing, the trial court held that the police officer's observations justified his challenged action. At an hour when the streets were virtually deserted, he had observed a van, in which the front seat passenger was a man whose headgear and hispanic features fitted the broadcast description of one of the suspects, traveling along a recognized escape route twenty-five minutes after the commission of the crime. Viewing the totality of the circumstances, *Brown v. United States*, 546 A.2d 390, 393 (D.C.1988), we agree with the motions court's finding that the "articulable suspicion" necessary to warrant a *Terry* stop was present here. *District of Columbia v. M.M.*, 407 A.2d 698 (D.C.1979); *Irby v. United States*, 342 A.2d 33 (D.C.1975).

We perceive no error by the trial court in excusing a witness called by the defense who invoked his Fifth Amendment right to avert self-incrimination, notwithstanding the Sixth Amendment right of the accused to compulsory process. When these rights collide, as happened here, our court has laid down two conditions which must be met before a witness posing the likelihood of self-incrimination may be permitted to withhold testimony. *Jaggers v. United States*, 482 A.2d 786, 793 (D.C. 1984), *citing In re Corrugated Container Antitrust Litigation*, 213 U.S.App.D.C. 319, 327, 662 F.2d 875, 883 (1981), requires a determination by the trial judge that the testimony is incriminatory, and that a real and substantial risk of prosecution exists. In short, before ruling, he must decide whether the totality of the circumstances provides a realistic foundation for the witness' apprehension of prosecution. *Davis v. United States*, 482 A.2d 783, 785 (D.C. 1984), *aff'd*, 509 A.2d 105 (D.C.1986), *reh'g granted and vacated on other grounds*, 518 A.2d 712 (D.C.1986) (en banc).

In the instant case, according to a proffer by defense counsel, the reluctant witness was in possession of the getaway van until 9:30 p.m. on the night of the crime when appellant and another man appeared and "reclaimed" it. As the vehicle had previously been reported stolen from the lot of Banning Motors, such testimony, if compelled, was almost tantamount to an admission of the offense of unauthorized use.[2] Responding to questions of the trial judge, government counsel would not agree either to grant immunity or to refrain from prosecution.

Given the representations of the government, the severity of the potential penalty, and the view expressed by the witness' counsel that his testimony could provide the basis for a felony prosecution, we cannot hold improper the trial court's disposition of the issue. *See Jaggers, supra*, 482 A.2d at 793 n. 3.

Appellant's contention that his sentence (concurrent terms of eight to twenty-four years) amounted to the infliction of "cruel and unusual punishment" may be rejected summarily. Recognizing that the length of the term—appellant had a record of a prior felony conviction—was below the

---

2. Under D.C.Code § 22–3815(b), (d)(1) a person convicted of unauthorized use of a motor vehicle may be sentenced to imprisonment for a term as long as five years.

maximum the court could have imposed, this argument is based on the fact that when sentence was announced, appellant was in a wheel chair suffering from a back injury, and, hence, could not expect adequate medical treatment if sent to Lorton because of the deplorable hospital conditions at that institution. Appellant relies on a federal district court decision, *Inmates of Occoquan v. Barry*, 650 F.Supp. 619 (D.D.C.1986). But that decision was vacated by the court of appeals for this circuit, 269 U.S.App.D.C. 210, 844 F.2d 828 (1988), as inconsistent with *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

*Affirmed.*