Thomas J. BROWN, Jr., Appellant

v.

UNITED STATES, Appellee.

No. 01–CF–834.

District of Columbia Court of Appeals.

Argued Jan. 21, 2004.

Decided Jan. 6, 2005.

Robert S. Becker, Washington, appointed by the court, for appellant.

Tejpal S. Chawla, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Barbara J. Valliere, and Anthony S. Barkow, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, FARRELL, and REID, Associate Judges.

TERRY, Associate Judge:

In a four-count indictment, appellant was charged with malicious destruction of property, first-degree theft, receiving stolen property, and unauthorized use of a vehicle ("UUV"). The jury found appellant guilty of UUV but acquitted him of destroying property and receiving stolen property. The jury was unable to agree on a verdict on the charge of first-degree theft, and it was later dismissed. On appeal, appellant contends that the trial court erred by improperly coercing a defense witness (appellant's wife) into invoking her Fifth Amendment privilege and by not conducting a question-by-question review of the same witness' Fifth Amendment claim. We affirm.

I

### A. The Government's Evidence

At around 9:30 p.m. on June 30, 1997, Denise Mayhew returned home from shopping in her 1994 green Mazda [1] with her daughter and her sister, Glenda Gray.[2] Ms. Mayhew parked the Mazda in front of her home on Nicholson Street, N.W., then locked the car and placed "the Club" [3] on the steering wheel. Mayhew testified that, as of that date, she had only one ignition key to the Mazda and had never given anyone permission to make copies of her car keys.

---

1. The Mazda was purchased with the assistance of Ms. Mayhew's cousin, Rhonda Guillette, because Mayhew's credit "was messed up." The car's title and tags were in Guillette's name, but Mayhew made all the payments on the car, dealt with its maintenance, and paid for its insurance.

2. Ms. Gray lives in the same apartment building as her sister, Ms. Mayhew.

3. "The Club" is the commercial name of a widely available anti-theft device.

The next morning, Ms. Gray noticed that the Mazda was no longer in front of the apartment building and immediately told her sister, Ms. Mayhew. Mayhew then went outside to investigate and confirmed that the Mazda was not where she had parked it. She became very emotional, began to cry, and repeatedly exclaimed, "Oh, my God. Where is my car?" Because she had not given anyone permission to drive her car and because she was not aware that anyone else possessed a duplicate key, Ms. Mayhew called the police and reported the Mazda as stolen.

Almost two months later, on August 25, at approximately 7:30 p.m., Officer Maurice Turner was on patrol in Northeast Washington when he saw a green Mazda with its rear window smashed in and the defroster wires exposed. Officer Turner activated his police car's emergency lights and siren, intending to make a traffic stop of the Mazda. As soon as the patrol car's emergency lights began to flash, however, the Mazda started to speed away. With Officer Turner in pursuit, the Mazda reached speeds of approximately sixty-five to seventy miles per hour in a thirty-mile zone. After a brief car chase, Officer Turner was able to "box[] him in" at a parking lot. Appellant jumped out of the Mazda and "tried to run," but the officer caught up with him a few feet away and placed him under arrest.

Officer Turner then examined the Mazda and was surprised to find appellant's two children sitting in the car. The Mazda was later identified as the one that Ms. Mayhew had reported stolen. There was a duplicate key in the ignition. The car had been seriously damaged[4] and was later declared a "total loss" by Ms. Mayhew's insurance company.

Ms. Mayhew was "shocked" to learn that appellant had been driving her car when the police recovered it because she had known him for many years. The two of them had formerly had an "on and off romantic relationship" which began in 1982 and ended amicably in 1989.[5] They resumed their friendship after a chance meeting in the fall of 1996 and visited Florida together with Ms. Mayhew's daughter[6] shortly thereafter. During this trip, both Mayhew and appellant drove the Mazda, and appellant had possession of the car alone for one day. At the conclusion of the Florida trip, however, Ms. Mayhew told appellant that she did not want to see him again "because of his behavior."[7] Mayhew never again gave appellant or anyone else permission to drive or use her car.

### B. *The Defense Evidence*

The defense theory of the case was that appellant and Ms. Mayhew were involved in an extramarital affair for many years, that appellant had keys to both her apartment and her car, and that he therefore had "no reason to believe that he should not have been in her car" after it was

---

4. The Mazda's seats were ripped, the contents of the glove compartment were strewn about, the rear window was shattered, and the steering wheel cover was cut and slit open.

5. Ms. Gray testified that Ms. Mayhew and appellant had had a relationship together during the 1980s, but that it had ended by the early 1990s.

6. Appellant is not the father of Ms. Mayhew's daughter.

7. Ms. Mayhew was upset that appellant had cursed around her daughter; she found such conduct very "disrespectful." She did not see appellant again after the Florida trip until she came to court to testify at his trial. She did not know appellant was married when they went to Florida together, and said that she had never met his wife.

reported stolen in July 1997. Defense counsel further posited "that [Ms. Mayhew] claimed [appellant] had stolen her car in retaliation for his refusal to leave his wife." In support of this theory, appellant called his brothers, Elijah Brown and Sean Brown, as witnesses.

Elijah Brown testified that he knew Ms. Mayhew, that he had gone on a trip to San Francisco with appellant and Ms. Mayhew,[8] and that he had been to Mayhew's apartment about forty times and had been inside that apartment at least ten times. In addition, Elijah stated that he had dropped off appellant at Mayhew's house between fifteen and twenty times so that appellant could use the Mazda, and that he had seen appellant driving the car "hundreds" of times between 1994 and 1997.[9]

Sean Brown testified that he had known Ms. Mayhew for over ten years and that he had been to her apartment more than twenty times. He said that he was familiar with the Mazda because he "did ... some work on it" and that he "put a CD player in that car."[10] Sean also stated that appellant had his own key to the Mazda and that between 1994 and 1997 he had seen appellant and Ms. Mayhew together in the car seven or eight times and appellant alone in the car more than ten times. Sean also said he had seen Ms.

Mayhew at appellant's home on a few occasions following appellant's marriage and had also seen appellant's wife and Mayhew together in the same place a few times.

### C. The Potential Testimony of Sandra Brown

Prior to trial, counsel for both parties responded in the negative when the court asked whether either of them knew if any witnesses to be called might have Fifth Amendment privilege issues. After the trial began the next day, however, the prosecutor informed the court that there was a potential Fifth Amendment problem as to appellant's wife, Sandra Brown, who was likely to be called as a defense witness. The prosecutor said that if Sandra Brown took the stand, he would seek to cross-examine her about whether she ever offered money to Ms. Mayhew so that Mayhew would drop the charges against appellant, since such an offer "might be an obstruction." The court, with the apparent concurrence of both parties,[11] subsequently ruled that "even if she says that never happened, she needs to be counseled."

Later in the trial, the court appointed an attorney to advise Sandra Brown about her Fifth Amendment rights. After conferring with Mrs. Brown and appellant's

---

8. In her rebuttal testimony, Ms. Mayhew testified that she had never been on a trip with Elijah Brown. She did concede, however, that she "joined" appellant and his brothers in San Francisco after winning a plane ticket from her employer in 1985 or 1986.

9. Ms. Mayhew stated in rebuttal that appellant never accompanied her in the Mazda between the years 1994 and 1997 except for their trip to Florida in 1996.

10. Ms. Mayhew testified in rebuttal that she always took the Mazda to the dealer for maintenance because it was under warranty and that her car had a cassette player, not a CD player.

11. At a bench conference, the following occurred:

> MS. JACQUES [defense counsel]: I think it's a non-issue, but I would feel more comfortable if—
>
> MR. BARKOW [the prosecutor]: And I am definitely intending to cross-examine her.
>
> THE COURT: So she needs to be counseled. Even if she says that never happened, she needs to be counseled.

Neither party objected to the court's suggestion.

counsel, Mrs. Brown's attorney told the court that there was a Fifth Amendment issue and that he had advised Mrs. Brown of what this meant, but that she was "having trouble making a decision whether she wishes to waive that or not." Because of Sandra Brown's sudden hesitancy to testify, defense counsel was no longer certain that he would call her as a witness and suggested that some sort of immunity for her might be considered. Recognizing the importance of this request, the court said:

> If you are going to request that, then obviously it would take some time for the government to even discuss that with her and it wouldn't be something we could anticipate ruling briefly Monday morning.... If there is an issue of considering immunity, if you are requesting to call her, and that would·end that issue, I want to allow the government adequate time to consider where that leaves us, and they may want to interview her and further investigate.

The next day, which was a Friday, defense counsel stated that Sandra Brown would be called as a witness and added, "She's an essential witness to my case." The court replied that to "trump" Sandra Brown's Fifth Amendment privilege against self-incrimination and enable her to testify, counsel must show that the testimony he sought to elicit was "material, exculpatory, non-cumulative, and unobtainable from any other source." *See Carter v. United States,* 684 A.2d 331, 340 (D.C. 1996) (en banc) (citing *United States v. Rivera,* 971 F.2d 876, 887 (2d Cir.1992)). Counsel proffered that Sandra Brown would testify that: (1) she had known Ms. Mayhew for many years (the two having had contact, words, and occasional alterca-

tions with each other); (2) she had seen appellant driving the Mazda; (3) she herself had ridden in Ms. Mayhew's Mazda while appellant was driving; and (4) appellant had keys to the Mazda. The court remarked that counsel's initial proffer was incomplete, but that it would defer ruling on the matter until "more specific facts" could be obtained from Mrs. Brown.

After Sandra Brown arrived in court later that day, defense counsel told the court that Mrs. Brown would "waive her Fifth Amendment privilege and ... take the stand and testify as to what she knows." Counsel felt that this resolved the privilege dilemma, and the prosecutor agreed, provided that he would be allowed to conduct a full cross-examination. At the same time, the prosecutor informed the court *ex parte* at a bench conference [12] of a new possible line of cross-examination concerning Sandra Brown's alleged perjury in a different case, also involving appellant.[13] The prosecutor said to the court, "I'm not sure yet if I can use that. I just got the information.... It's information that I have that I'm going to try to come up with some way that I might be able to use it.... I wanted to tell Your Honor so that I didn't surprise the court with it." In the ensuing discussion, the court voiced uncertainty about the basis of Sandra Brown's Fifth Amendment privilege because it had not been clearly communicated.

Mrs. Brown's attorney then said that Mrs. Brown would waive her privilege with regard to the obstruction of justice allegation, but that she was unsure whether she would also waive her privilege as to the potential criminal liability for UUV as a

---

**12.** Sandra Brown's attorney, who had already been informed of the proposed line of cross-examination, accompanied the prosecutor to the bench.

**13.** The prosecutor had just learned of this possible perjury after speaking with another Assistant United States Attorney.

passenger in the Mazda, as well as the possible perjury in the earlier case. The court decided to give Mrs. Brown the weekend to decide whether, and to what extent, she would waive her Fifth Amendment privilege:

> If she decides that she does wish to waive her Fifth Amendment right, I'll ask her a series of questions with her counsel present here, out of the presence of the jury, and we'll resolve that, and then you'll be able to call her if she does waive. If she doesn't, at that point, it's going to be incumbent [on] the defense to establish the more refined proffer and overcome the four-part [*Carter*] test.

Neither party objected.

The following Monday, Sandra Brown invoked her Fifth Amendment privilege with respect to "riding in the car during the time it's alleged to have been stolen" and the "possible perjury on a prior occasion." In response, defense counsel made a specific proffer under *Carter*:

> I do believe that if Mrs. Brown were to testify, she would state that she had seen [appellant] in the car in 1997. I don't believe I could give the court a month. I could say warm weather and the children were out of school. So I could say May or June, maybe.[14]

Defense counsel then conceded, "I don't know that I could meet the fourth prong of *Carter*, unobtainable from any other source." After hearing further from both parties, the court found that the testimony that defense counsel wanted to elicit from Sandra Brown was "not exculpatory," but possibly inculpatory,[15] and that in addition it might be obtainable from another source. The court then advised counsel,

"If there is another area that you offer [Sandra Brown] for, or if it develops ... we could consider that." Defense counsel never objected to the court's ruling and did not call Sandra Brown thereafter to testify on any other issue.

## II

Appellant makes two claims of error regarding Sandra Brown's potential testimony. He contends (1) that the prosecutor intimidated Sandra Brown, a key defense witness, into invoking her Fifth Amendment right to remain silent, thereby denying appellant his Sixth Amendment right to compulsory process, and (2) that the trial court used an improper procedure after Mrs. Brown invoked her Fifth Amendment privilege. These claims are inconsistent with positions taken by defense counsel at trial and thus are not properly raised on appeal.

 This court will not permit a party to "assert one theory at trial and another theory on appeal." *Byrd v. United States,* 502 A.2d 451, 453 (D.C.1985) (appellant did not assert that lineup was unduly suggestive at trial, but argued on appeal that lineup was unduly suggestive) (citing *Hackes v. Hackes,* 446 A.2d 396, 398 (D.C. 1982)); *accord, Brown v. United States,* 627 A.2d 499, 508 (D.C.1993) (appellant cannot challenge on appeal a failure by the trial court to instruct the jury on a certain issue after asking the court at trial not to give such an instruction; "[w]e have repeatedly held that a defendant may not take one position at trial and a contradictory position on appeal" (citations omitted)); *cf. Gonzalez v. United States,* 697 A.2d 819, 826 (D.C.1997) (prejudicial testimony

---

**14.** The court noted that this "revised proffer" was "a little bit different than what you said last week."

**15.** "Rather than being exculpatory, it might be just one more instance of the complained-of act."

elicited by defense counsel during cross-examination is invited error and cannot be challenged on appeal). In the present case, both of appellant's current arguments are inconsistent with positions taken at trial by his trial counsel.[16]

### A. Alleged Prosecutorial Misconduct

■ Appellant argues that the prosecutor improperly prevented Sandra Brown from testifying about Ms. Mayhew's bias against appellant, which supposedly stemmed from an alleged love triangle involving the three of them. At trial, however, appellant never called Sandra Brown to testify about Ms. Mayhew's alleged "bias," even though Mrs. Brown did not invoke her Fifth Amendment privilege on the bias issue.[17] Defense counsel's specific proffer after Sandra Brown invoked her Fifth Amendment privilege was only that Mrs. Brown had seen appellant, her husband, driving the Mazda during the summer months. The trial court even noted that this proffer, made on the Monday after the privilege issue came up, was "different than what you said last week."[18] On this record, it is apparent to us that appellant waived his argument that "his Sixth Amendment rights were violated by [Sandra Brown's] failure to testify on his behalf" because it is clear that appellant never made a specific proffer concerning

Sandra Brown's possible bias testimony based on the supposed love triangle. *See Boone v. United States*, 769 A.2d 811, 823 (D.C.2001).

### B. Question–by–Question Review

■ Appellant also maintains that the trial court erred by failing to ask Sandra Brown, question by question, the basis on which she believed she might incriminate herself. Defense counsel at trial, however, did not object to the court's making a more general inquiry to determine whether Mrs. Brown was eligible for immunity so that she could testify on appellant's behalf; in fact, defense counsel twice proposed such a procedure. When the matter first arose, counsel suggested that the prosecutor might be "open to maybe discussing with Mrs. Brown some oath of immunity." The following Monday, when the question came up again, counsel said, "Your Honor, I would like to ask the government if they would debrief Mrs. Brown to see if they would grant her immunity to testify"—the very procedure suggested in our *Carter* opinion, 684 A.2d at 344–345. Counsel also did not object to Mrs. Brown's assertion of her privilege against self-incrimination,[19] nor did she request that the court undertake a question-by-question review of Mrs. Brown's assertion of a Fifth Amendment

---

16. Appellant is represented on appeal by newly appointed counsel.

17. Mrs. Brown invoked her privilege only as to questions about "riding in the car during the time it's alleged to have been stolen" and her "possible perjury on a prior occasion."

18. The proffer made on Friday, May 18, was that (1) Sandra Brown had known Ms. Mayhew for many years, (2) she had seen appellant driving the Mazda; (3) she herself had ridden in the Mazda while appellant was driving; and (4) appellant had keys to the Mazda. The bias testimony which appellant now asserts Sandra Brown would have provided if

she had not been intimidated concerned an alleged love triangle between herself, appellant, and Ms. Mayhew. (Such testimony, we note, would have contradicted Mayhew's testimony that she had never met Sandra Brown.) The revised proffer made on Monday, May 21, however, eliminated any mention that Mrs. Brown would testify that she knew Ms. Mayhew.

19. The court even said, after defense counsel's failed attempt to gain immunity for Sandra Brown, that she had a "legitimate Fifth Amendment right, which ... [her counsel] stated last week, and I think it goes without saying it's well taken."

privilege, despite the court's willingness to do so if she chose to waive that privilege.[20] Because defense counsel agreed with the court that a *Carter* inquiry was the proper procedure after Mrs. Brown said she would invoke her Fifth Amendment privilege on two grounds if called as a witness, appellant cannot now claim procedural error. *Brown,* 627 A.2d at 508.

## III

In any event, even if we assume that the issue was properly preserved for appellate review, appellant's claims of error still fail.

### A. *Alleged Prosecutorial Misconduct*

■ Appellant contends that the prosecutor committed misconduct by depriving him of the testimony of Sandra Brown through intimidation. He specifically alleges that the prosecutor intimidated Mrs. Brown into not testifying when he threatened to prosecute her for three separate crimes: obstruction of justice, UUV (because she had been a passenger in a stolen car), and committing perjury in a prior trial to aid her husband's defense in that trial. This claim of prosecutorial misconduct is entirely without foundation.

■ "The right of a defendant to establish a defense by presenting his own witnesses is a fundamental element of due process of law." *United States v. Simmons,* 216 U.S.App. D.C. 207, 210, 670 F.2d 365, 368 (1982) (citation omitted), *aff'd after remand,* 226 U.S.App. D.C. 98, 699 F.2d 1250 (1983); *see Boone,* 769 A.2d at 823. It is also well recognized that "governmental interference can deprive a defendant of this right." *Reese v. United States,* 467 A.2d 152, 155 (D.C.1983) (citations omitted); *see, e.g., Webb v. Texas,*

409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (defense witness intimidated by remarks of trial judge); *United States v. Morrison,* 535 F.2d 223 (3d Cir.1976) (defense witness intimidated by a barrage of warnings and an illegal subpoena directing her to come to the prosecutor's office for an interview prior to her testimony). "[W]arnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify." *United States v. Blackwell,* 224 U.S.App. D.C. 350, 359, 694 F.2d 1325, 1334 (1982). However, "[t]he mere advising of one individual of his rights, where there is a justifiable occasion for doing so, does not in turn infringe upon the constitutional rights of another even though the election to exercise those rights might deprive the other of a possible advantage in his defense." *Commonwealth v. DiGiacomo,* 463 Pa. 449, 454, 345 A.2d 605, 607 (1975), *quoted with approval in In re J.W.Y.,* 363 A.2d 674, 684 (D.C. 1976). To obtain reversal on appeal, appellant must establish that the alleged misconduct rose to the level of "substantial prejudice," *i.e.,* that "the misconduct substantially swayed the judgment." *Reese,* 467 A.2d at 156 (citations omitted).

In the present case, we see no reason to characterize the prosecutor's actions as intimidating. Each time the prosecutor came forward to notify the court of a possible Fifth Amendment concern, he did so as soon as he realized there was a possibility that the witness might have a Fifth Amendment privilege. The prosecutor was attempting to answer more fully the court's initial question, just before trial, about whether there were "any Fifth Amendment rights of witness[es]" to dis-

---

**20.** The court said, "If she decides that she does wish to waive the Fifth Amendment right, I'll ask her a series of questions with her counsel present here, out of the presence of the jury . . . ."

cuss.[21] Most significantly, none of the statements regarding the witness' possible exposure to prosecution were made to the witness herself, but only to counsel and the court. Each time a possible Fifth Amendment concern was discovered, it was brought to the court's attention out of the hearing of the witness. We are fully satisfied that the prosecutor "stayed well within acceptable limits" and that his conduct gives "rise to no legitimate constitutional complaint." *Blackwell,* 224 U.S.App. D.C. at 361, 694 F.2d at 1336; *see Holbert v. United States,* 513 A.2d 825, 826–827 (D.C. 1986). Moreover, at trial defense counsel did not even suggest that the prosecutor's statements might be an attempt to "chill" Sandra Brown from testifying.[22] We find no misconduct by the prosecutor.

B. *Question–by–Question Review*

 The trial court's inquiry into Sandra Brown's Fifth Amendment privilege was thorough and proper. This court has stated that "when a Fifth Amendment claim is asserted by someone other than the defendant, the court must ordinarily permit examination of the witness ... one question at a time." *Harris v. United States,* 614 A.2d 1277, 1282 (D.C.1992); *see Littlejohn v. United States,* 705 A.2d 1077, 1083 (D.C.1997). This procedure is designed to prevent witnesses from attempting to excuse themselves altogether from testifying by claiming a blanket Fifth

Amendment privilege. *See Brown v. United States,* 589 A.2d 434, 436 (D.C.1991). But when the witness does not make such a blanket claim, there is usually no need for the court to follow a question-by-question procedure (although the court, of course, may do so if it is appropriate for some other reason).

In the instant case, the Fifth Amendment claim was not broadly stated by the witness, and as a result the court had no occasion to ascertain the specificity of the claim. The privilege was invoked with regard to only two specific issues, one involving Mrs. Brown's riding in the Mazda with appellant during the summer months (after it was reported stolen) and the other relating to her possible perjury in an earlier trial. The trial court accepted these claims of privilege without further discussion—and without objection from either side—because it concluded, after hearing defense counsel's proffer about Sandra Brown's potential testimony, that "it goes without saying [that her assertion of a Fifth Amendment privilege is] well taken." Indeed, trial judges often rely on proffers by counsel instead of a formal questioning procedure to make privilege determinations. *See, e.g., Jones v. United States,* 566 A.2d 44, 46 (D.C.1989). We have never forbidden the practice of relying on proffers in such situations, and we see no reason to disapprove it here.

---

21. The prosecutor first told the court that an obstruction of justice charge against Sandra Brown might be a possibility after he learned that the defense intended to call her as a witness. The second potential Fifth Amendment issue, involving Mrs. Brown's riding as a passenger in a stolen car, was brought to the court's attention by Mrs. Brown's counsel, not by the prosecutor. Finally, the possible perjury stemming from Mrs. Brown's testimony in a separate trial (involving the very same defendant, her husband) was brought to the court's attention almost immediately after the prosecutor learned of it.

22. In the *Reese* case, after the prosecutor informed the witness' counsel of a possible prosecution if the witness were to incriminate himself during his testimony, defense counsel immediately objected. Counsel complained that the prosecutor was attempting "to chill his witness' intention to testify," given the timing of the prosecutor's information and the manner in which it was communicated. *See Reese,* 467 A.2d at 155. In the instant case, by contrast, defense counsel never objected or even hinted that the prosecutor was acting in an intimidating manner.

IV

Appellant's conviction is *Affirmed.*