Terence J. BUTLER, Appellant,

v.

UNITED STATES, Appellee.

No. 02–CF–1268.

District of Columbia Court of Appeals.

Argued Nov. 16, 2004.

Decided Jan. 12, 2006.

Brigitte L. Adams, appointed by the court, for appellant.

L. Jackson Thomas, II, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Elizabeth Trosman and Alex J. Grant, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge,* TERRY, Associate Judge, and NEBEKER, Senior Judge.

TERRY, Associate Judge:

Appellant was convicted of unauthorized use of a vehicle and receiving stolen property. Prior to trial, appellant sought immunity from the government for his cousin, Francis Cooper, who was present in the stolen automobile when appellant was arrested. Mr. Cooper's appointed counsel proffered that his client would give exculpatory testimony in exchange for a grant of immunity, but the government denied his request for such a grant. In addition, the trial judge ruled, without examining Mr. Cooper, that he could assert a blanket Fifth Amendment privilege if called to testify. As a result, appellant was the sole defense witness at trial. He now argues that the trial court denied him a fair trial by accepting Mr. Cooper's Fifth Amendment claim of privilege, and by failing to sanction the government for its refusal to grant Mr. Cooper immunity. We reject both arguments and affirm the judgment of conviction.

I

A. *The Government's Evidence*

Rosa Giggetts purchased a 1985 Buick LeSabre in October of 2001. The car was stolen from the parking lot of Ms. Giggetts' apartment building in Oxon Hill, Maryland, sometime between 11:00 p.m. on January 15 and 5:45 a.m. on January 16, 2002. Ms. Giggetts immediately notified the Prince George's County Police Department that her car was missing.

Six days later, shortly before midnight on January 21, Officer William Suter of the Metropolitan Police saw a Buick LeSabre that matched the description of Ms. Giggetts' missing car. The car was traveling down a street in Southeast Washington, but the officer lost sight of it near the Arthur Capper Dwellings, a housing project. He sent out a radio transmission to his fellow officers alerting them that a car that had been reported stolen was in the area, and giving a description of the car and its license number. He eventually spotted the Buick again and began to follow it.

In response to Officer Suter's radio alert, Officer Sheryl Harley drove her marked police car to the 1000 block of Fifth Street, Southeast. There she saw a Buick LeSabre traveling south on Fifth Street which matched the description Officer Suter had given over the radio. Officer Suter, in another police car, had activated his emergency lights and was pursuing the Buick. Officer Harley watched as the Buick traveled approximately fifty feet, then "nosed" into the curb and stopped. Both officers immediately aimed their spotlights on it. Officer Harley got out of her car, drew her weapon, and approached the Buick, along with Officer Suter and a third officer who had just arrived on the scene.

As Officer Harley moved from the middle of the street toward the driver's side of

---

* Judge Washington was an Associate Judge of the court at the time of argument. His status changed to Chief Judge on August 6, 2005.

the car, she saw appellant in the driver's seat. Officer Harley then went around to the passenger side while Officer Suter approached appellant; a fourth officer, Frederick Piquette, focused on a passenger in the left rear seat. Officer Suter removed appellant from the car and placed him under arrest. The three passengers were also ordered to get out of the car; they were frisked for weapons and subsequently released. Officer Piquette searched appellant for weapons and found a screwdriver in the pocket of his sweatshirt.

Officer Harley noticed that the Buick's steering column was broken and that the key in the ignition was not an ignition key. Pieces of plastic and wires were held together by a yellow bandana that was tied around the steering column. When Ms. Giggetts eventually retrieved her car from a police storage lot, she discovered that the trim had been painted a different color, the license plate had been moved from the front of the car to the dashboard, and several personal belongings were missing.[1] Moreover, she testified that the muffler had come off, the engine "was leaking oil [and] was smoking," and "the guy at the storage place had to show us how to start the car with a screwdriver" until the ignition could be repaired.[2]

### B. *The Defense Evidence*

Appellant testified that on January 21, at about 11:00 p.m., he was "hanging out" in a courtyard on Fifth Street, Southeast, with his cousin, Michael Tillman. He said that as he stood on the corner, he saw a grey car driving south in the 1000 block of Fifth Street, followed by a police cruiser. The grey car stopped at a stop sign and then turned right onto L Street, but the police car turned left. Approximately five minutes later, the grey car returned to the same block of Fifth Street, but the police car was no longer following it. When the grey car stopped near appellant, he recognized his cousin, Francis Cooper, in the front passenger seat. The driver of the car then got out and walked into the courtyard, and appellant approached the car and sat in the driver's seat to talk to Mr. Cooper. There were two other people in the back seat of the car.

As appellant sat in the Buick, talking to his cousin, a police car turned right onto Fifth Street and activated its emergency lights. The police car then stopped directly behind the Buick and shined its spotlight on the car's occupants. Police officers approached, and one of them repeatedly told appellant to "turn the car off." Appellant tried to turn off the ignition, but the key would not work, so he "just stood there." The officers then ordered all the occupants to get out of the car and raise their hands. One of the officers opened the car door, grabbed appellant, threw him to the ground, and handcuffed him. Appellant asked the officers why he was being arrested, and one of the officers replied, "You know you stole that car."[3] The officers then placed appellant in the police car.

Appellant denied being inside the Buick while it was moving. He stated that he

---

1. These included the car's registration card, a wooden cross, her husband's tools, and her daughter's car seat.

2. Michael DePrince, a Crime Scene Search Technician, testified that a screwdriver is commonly used by car thieves to start the engine of a stolen car in lieu of an ignition key.

3. Officer Piquette testified on rebuttal that, during an exchange between appellant and the police about why appellant was arrested and whether the car was stolen, appellant claimed that a friend had given him the car and that he had been driving it for four months. Appellant denied making this statement.

had no reason to think the car was stolen because there was a key in the ignition, although he admitted he did not notice the size of the key. He also believed that the driver had decorated the steering wheel with the bandana. Appellant testified that the screwdriver recovered by Officer Piquette was not on his person, but in fact was lying on the floor of the car.

### C. Mr. Cooper's Proffered Testimony

Before trial, appellant subpoenaed Francis Cooper, his cousin, to testify for the defense. Mr. Cooper, who was in the passenger seat of the stolen Buick when appellant was arrested, appeared at trial with appointed counsel. According to proffers made by appellant's attorney, a defense investigator, and Mr. Cooper's counsel, Mr. Cooper would testify that he was in the stolen car immediately before appellant was arrested; that appellant did not drive the car; that the driver left the car before appellant got in; and that appellant entered the car only minutes before the police arrived. Mr. Cooper, however, asserted his Fifth Amendment privilege against self-incrimination and refused to testify. The trial court ruled, without examining Mr. Cooper at all, that he "had a right" to assert the privilege.

Mr. Cooper also refused to speak with the prosecutor for fear of being charged with a crime. Because it could not debrief him, the government chose not to immunize Mr. Cooper. When the court asked why, the prosecutor responded:

The government really doesn't have any information by which to evaluate the request for granting immunity. I mean, without talking to him ... the government certainly is not prepared to grant use immunity for testimony that it thinks is going to be perjured, for example.... And not having spoken to him, it just kind of puts us in an impossible position.

And if I might, I would say in almost any other circumstance, aside from this case, *the government would want some kind of debriefing before it considered any kind of immunity.* So it's not like the government is singling out this witness for unfair treatment, but ... we don't really know what he's going to say. [Emphasis added.]

After a brief discussion, the court recognized that the issue it had to decide was whether the government's decision not to grant immunity under the circumstances was reasonable under this court's decision in *Carter v. United States,* 684 A.2d 331 (D.C.1996) (en banc). Addressing appellant's counsel, who complained that the government was being "more than unreasonable," the court said:

As [the prosecutor] says, they don't know whether he is going to [give] perjured testimony, trying to help out a friend of his, or something like that.

They have no way of testing it, no way of analyzing it. They are not just supposed to give it at this point in time. [There] has to be some sort of showing.

Appellant's counsel argued that the government was acting in bad faith "because clearly the police officers ... knew that there were other persons in the car.... [T]hey didn't do a thorough investigation before charging Mr. Butler with this crime." The court, however, rejected counsel's claim that the government was acting in bad faith, saying that *Carter* required more than an assertion that the government "grant[s] immunity every day and they haven't granted it to me in this case ...." The court reminded counsel that Mr. Cooper, the proposed witness,

has indicated no, I'm not going to even proffer to the government, so the government doesn't have a chance to talk to the person, to test the person's credibili-

ty, to do anything like that. You're asking the government in essence to grant immunity without doing its homework.... [Y]ou're saying notwithstanding the fact that the person won't even proffer, that that person ... should be given immunity in the blind.

Counsel agreed that that was the substance of her request.

The discussion continued for a short time, and then the court recessed for lunch. During the recess, the court and all counsel reread the *Carter* case. When the proceedings resumed, Mr. Cooper's counsel restated his earlier proffer:

The proffer would be that he [Cooper] was present. It would be that he would be in the car, and that he would testify that the defendant came into the car ... just prior to the police arriving, that he was not the driver of the car. When the car was parked, the driver who had been driving the car left, got out and left and went someplace, and that Mr. Butler got in the car just shortly before the police arrived. And that there were two other people in the back seat.

The prosecutor responded that he understood "the gist of what [Cooper's attorney] just indicated," but that it was "a rather incomplete story":

There are a lot of things that I would want to follow up on, and to judge the witness' credibility, to check the story out with other facts that I know, and the problem is that we would just be flying blind. And I think it would be a poor use of our prosecutorial discretion to immunize such a witness.

The prosecutor reiterated that he still wanted to talk to Mr. Cooper, but Cooper's counsel said that Cooper did not wish to talk to the prosecutor. Cooper himself said nothing.

Further discussion ensued,[4] and then the court said:

I think it's the government's responsibility to make sure or to check out the witness' story, to make sure that it fits. They're the ones that have to ... guard against whether people get together and tell a story or not. And until they have a basis for saying we talked to a person, we have looked at it, I cannot say that they're intentionally withholding something or failing to comply with *Carter*'s requirements.

The court ultimately ruled that there was no bad faith or unreasonableness on the part of the government in denying Mr. Cooper's request for a grant of immunity. In so ruling, the court said, "I can't say that the government is not justified or that they ... do not have a strong interest in withholding immunity. So I'm not going to [impose] sanctions for the government's failure to do so."

## II

■ Appellant argues that the court erred when it granted Mr. Cooper a blanket Fifth Amendment privilege without first conducting a proper inquiry about the substance of his proposed testimony and assessing the likelihood that it might incriminate him. We agree that the court should have conducted a more extensive inquiry before accepting the claim of privilege, but we are satisfied that the court's

---

4. After appellant's counsel complained when the prosecutor characterized Cooper's proffer as "vague," the prosecutor elaborated:

Your Honor, what I referred to as vague ... it appears to be an incomplete story, and it really does not have the ring of truth.

And it really kind of seems illogical in light of the other evidence the government has. So I guess it's not just the fact that we can't talk to him. What appears to be being said doesn't make much sense.

failure to do so was not so grave an error as to warrant reversal.[5]

 There is no dispute that a criminal defendant has a right under the Sixth Amendment to call witnesses in his own defense. *E.g., Johnson v. United States,* 746 A.2d 349, 355 (D.C.2000); *Littlejohn v. United States,* 705 A.2d 1077, 1083 (D.C. 1997); *Wilson v. United States,* 558 A.2d 1135, 1140 (D.C.1989). That right, however, is not absolute. *Johnson,* 746 A.2d at 355; *Littlejohn,* 705 A.2d at 1082. In particular, it must yield to a witness' Fifth Amendment right to be free from compulsory self-incrimination. *Johnson,* 746 A.2d at 355. "In the crunch, when all else fails, the Fifth Amendment privilege of the witness prevails over the defendant's right to compel him to testify." *Wilson,* 558 A.2d at 1140 (citations omitted). Nevertheless, "[w]hen the protections of the two amendments come into conflict, the court must attempt to preserve them both to a reasonable extent." *Id.* (citations omitted); *accord, Littlejohn,* 705 A.2d at 1083.

 A witness' Fifth Amendment privilege "extends beyond answers that would in themselves support a conviction to those which would furnish a link in the chain of evidence against the witness." *Wilson,* 558 A.2d at 1141. It is "narrower than that of a defendant," however, "and extends only to specific questions; it does not encompass a refusal to take the stand at all." *Littlejohn,* 705 A.2d at 1083; *see Johnson,* 746 A.2d at 355. As a consequence, "when a witness' invocation of his Fifth Amendment privilege conflicts with a defendant's right to compulsory process under the Sixth Amendment, the trial court must 'rule on the claim of privilege *one question at a time.'"* *Johnson,* 746 A.2d at 355 (citations omitted and emphasis added); *accord, Brown v. United States,* 864 A.2d 996, 1004 (D.C.2005); *Davis v. United States,* 482 A.2d 783, 785 (D.C.1984) ("the trial court will generally have to permit an examination of the witness ... and rule on the claim of privilege as asserted when each question is propounded"). It is appropriate to grant a blanket Fifth Amendment privilege "only when it is evident to the court that anything less will not adequately protect [the witness]." *Littlejohn,* 705 A.2d at 1083 (citations omitted); *accord, Wilson,* 558 A.2d at 1142. In other words, a blanket privilege should be recognized only in "unusual cases" in which the court determines that there is a "reasonable basis for believing a danger to the witness might exist in answering *any* relevant question."[6] *United States v. Thornton,* 236 U.S.App. D.C. 29, 34, 733 F.2d 121, 126 (1984) (emphasis in original).

In the present case, the trial court did not examine Mr. Cooper in an effort to determine the extent of his Fifth Amendment right against self-incrimination. In-

---

**5.** The government argues that because appellant did not specifically object to the court's acceptance of Mr. Cooper's assertion of his Fifth Amendment privilege, he must now demonstrate plain error in order to win reversal. *See, e.g., United States v. Olano,* 507 U.S. 725, 732–734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). While it is true that defense counsel made no objection when the court ruled on Cooper's Fifth Amendment claim, there was a lengthy discussion at the beginning of the trial (as we shall discuss in part III of this opinion) about Cooper's being potentially subject to criminal prosecution for unauthorized use of a vehicle. Viewing the record as a whole, we are satisfied that the challenge to Mr. Cooper's claim of privilege was sufficiently preserved for appellate review.

**6.** We note that "when the witness does not make ... a blanket claim, there is usually no need for the court to follow a question-by-question procedure (although the court, of course, may do so if it is appropriate for some other reason)." *Brown,* 864 A.2d at 1004.

deed, the court granted Mr. Cooper a blanket Fifth Amendment privilege with only limited information about his proposed testimony and its tendency to incriminate him if he were forced to testify. Shortly before the trial began, the court discussed Mr. Cooper's situation with his appointed counsel:

> [COOPER'S COUNSEL]: Passenger UUV would certainly be a potential problem.[7]
>
> THE COURT: And the government may decide that he was more culpable than the defendant.
>
> [COOPER'S COUNSEL]: That's what I said, Your Honor.
>
> THE COURT: So that's why he's asserting [the] Fifth Amendment. So he has a right to assert the Fifth Amendment.

On the second day of trial, the topic of Mr. Cooper's Fifth Amendment privilege resurfaced in the context of a discussion with defense counsel about statements against penal interest:

> [APPELLANT'S COUNSEL]: Then why does he [Cooper] have a Fifth Amendment right?
>
> THE COURT: That's a different analysis. That's under the Fifth

Amendment. If there is a chance that the prosecutor will prosecute you on something, you have a right to assert the Fifth Amendment.

The preferred procedure in this instance would have been to evaluate, on a question-by-question basis, the likelihood that Cooper's testimony might incriminate him.[8] *See, e.g., Johnson,* 746 A.2d at 355; *Wilson,* 558 A.2d at 1142; *Davis,* 482 A.2d at 785. This should of course be done out of the presence of the jury. *See Martin v. United States,* 756 A.2d 901, 904–905 (D.C. 2000); *Bowles v. United States,* 142 U.S.App. D.C. 26, 32, 439 F.2d 536, 542 (1970) (en banc), *cert. denied,* 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971).

Nevertheless, the court's failure in this case to question Mr. Cooper and its subsequent grant of a blanket Fifth Amendment privilege, while perhaps procedurally flawed, constituted at worst harmless error. We say this because it is obvious that *any* testimony Mr. Cooper might have been able to offer would have put him in the car during the events in question, thereby subjecting him to prosecution for UUV as a passenger. *See In re C.A.P., supra* note 7. On the record before us, there is really no way that Mr. Cooper

---

**7.** This appears to be a reference to the legal principle that a passenger who rides in a stolen car, knowing that it is stolen, may be charged with unauthorized use of a vehicle (UUV). *See, e.g., In re C.A.P.,* 633 A.2d 787, 792 (D.C.1993); *cf. Stevens v. United States,* 115 U.S.App. D.C. 332, 334, 319 F.2d 733, 735 (1963) (affirming UUV conviction of the driver of a stolen car, but reversing conviction of a "mere passenger" when there was no evidence "that he knew [the driver] was using the car without authority of its owner").

**8.** We have stated that "trial judges often rely on proffers by counsel instead of a formal questioning procedure to make privilege determinations." *Brown,* 864 A.2d at 1004 (citing *Jones v. United States,* 566 A.2d 44, 46 (D.C.1989)). *Brown* is distinguishable from the instant case, however, because the witness in *Brown* invoked her Fifth Amendment privilege with regard to only two discrete issues. The trial judge could therefore rely on counsel's proffer because it addressed specific testimony. In the present case, by contrast, Mr. Cooper claimed a blanket privilege, so the proffers made by counsel and the defense investigator were limited to general information about which Mr. Cooper might or might not testify. For this reason the court should not have relied exclusively on the proffers in ruling on Mr. Cooper's assertion of his Fifth Amendment privilege, since the proffers may not have addressed specific issues that might have arisen had Mr. Cooper actually taken the stand.

could have testified without incriminating himself, or at least exposing himself to the possibility of a criminal charge. For this reason, although the court should have followed a different procedure, we cannot find a basis for reversal in the manner in which the court upheld the blanket claim of privilege.

### III

■ Appellant maintains, in addition, that the trial court erred in failing to dismiss his indictment on the ground of prosecutorial misconduct. Specifically, he claims that the government had an obligation under the *Carter* case to offer Mr. Cooper limited immunity in order to assess whether to grant him use immunity, and that its failure to do so prejudiced his defense. Thus, he argues, the trial court's failure to sanction the government and dismiss the case denied him a fair trial.

■ In cases such as this, "the decision as to what sanctions should be imposed or whether to impose any sanctions at all are matters committed to the trial court's discretion." *Williams v. United States,* 805 A.2d 919, 925 (D.C.2002). Here again, however,[9] the government contends that appellant failed to preserve this issue for appellate review, and that this court should therefore review his claim only for plain error. We cannot agree. The parties engaged in an extensive discussion—extending over twenty pages of transcript—about the issue of immunity, and defense counsel specifically stated that the government's unwillingness to grant Mr. Cooper immunity was "patently unfair" and "unreasonable." Throughout the course of the hearing on the matter, defense counsel "indicate[d] distinctly the [defendant's] thesis,"[10] *i.e.,*

that the prosecutor's conduct in failing to immunize Mr. Cooper was unreasonable, and hence unlawful. Thus it was clear what "action ... [counsel] desire[d] the court to take ... and the grounds therefor." Super. Ct.Crim. R. 51.

■ In *Carter* we outlined the procedure for evaluating a defense witness' request for immunity. First, the defendant must show that the proposed testimony is (1) material, (2) clearly exculpatory, (3) non-cumulative, and (4) unobtainable from any other source. 684 A.2d at 341. Once these factors have been established and the court has "conclude[d] preliminarily that the process should continue, the next step *might be* to institute a debriefing process of the proposed defense witness by the prosecution in order to determine whether the government will accede to a grant of use immunity to the witness ...." *Id.* at 345 (emphasis added). If, after the debriefing process, the government decides not to grant immunity, the court must "explore the basis of the government's refusal and decide whether there will be a distortion of the fact-finding process and the indictment should therefore be dismissed for a denial of due process and Sixth Amendment rights to the defendant, or some other commensurate remedy, unless the government agrees to grant 'use' immunity to the crucial witness." *Id.* (footnote omitted).

In the instant case, the trial court ruled that Mr. Cooper's testimony was exculpatory and unobtainable from any other source. Mr. Cooper refused to speak to the government at all, however, and the government therefore chose not to grant him immunity. The court held that the government's decision was not unreason-

---

9. See note 5, *supra.*

10. *Miller v. Avirom,* 127 U.S.App. D.C. 367, 370, 384 F.2d 319, 322 (1967) (footnote omitted).

able, given that the prosecutor could not examine Mr. Cooper because he refused to be questioned. Appellant nonetheless maintains that the government had an obligation under *Carter* to grant Mr. Cooper "limited" immunity for debriefing purposes, and that its failure to do so constituted misconduct for which the trial judge should have imposed sanctions. Appellant misconstrues the holding of *Carter,* which imposes no such obligation.

Although we said in *Carter* that a "worthwhile approach" to immunizing a witness would include granting that witness limited immunity for debriefing purposes, 684 A.2d at 342, neither *Carter* nor any other case *requires* the government to offer such immunity if the witness refuses to testify or even to be debriefed. The *Carter* opinion, read as a whole, makes clear that granting limited immunity is merely a suggestion, not a mandate. For example, we said that "such a witness *could be* debriefed," *id.* (emphasis added); that there may be "*other methods* of acquiring information adequate to determine intelligently whether a proposed defense witness should be granted ... immunity," *id.* at 342 n. 9 (emphasis added); and that the offer of limited immunity is only a "potential" one, *id.* at 343.

Moreover, in *Carter* we addressed the very situation presented in this case. We said:

> Under this procedure ... if the witness refuses to be debriefed by the government, notwithstanding a *potential offer* by the government to grant ... limited immunity for the purpose of debriefing, prosecutorial bad faith would hardly be present if a formal grant of "use" immunity to the witness is refused by the government, *as the prosecutor would not have obtained sufficient information to reach an intelligent conclusion for immunity pur-*

*poses* regarding the proposed testimony of the defense witness. So, the prosecutor would not then have acted unreasonably thereby denying the defendant due process of law.

*Id.* at 343 (emphasis added). In light of this statement, and of the permissive rather than prescriptive language of the opinion concerning the suggested process for evaluating a request for immunity, we are satisfied that the trial court in this case did not abuse its discretion when it determined that the government did not act unreasonably in declining to grant immunity to Mr. Cooper.

The important fact to remember is that the court heard from both sides, heard the proffer of Cooper's testimony, and then made its discretionary ruling. This was fully consistent with *Carter,* which leaves all decisions to impose—or not to impose— sanctions in cases such as this squarely within the discretion of trial judges. The *Carter* opinion was carefully crafted by this court to balance the right of a defendant to present a defense with the rights of a witness who might be subject to criminal prosecution if he testified, while at the same time recognizing the prosecutorial authority of the Executive Branch and the limitations on judicial review of that authority. It requires trial judges to exercise their discretion in each individual case in light of the circumstances presented, as the trial judge did here. Were we to accept appellant's argument, we would, in effect, be requiring the government to buy a pig in a poke in virtually every case and would eliminate any meaningful exercise of discretion by the judge. That would eviscerate *Carter* and render it useless as a guide to trial judges. We are not willing to do that; indeed, we cannot. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).

## IV

The judgment of conviction is *Affirmed.*